COURT OF APPEALS
SECOND DISTRICT OF TEXAS
FORT WORTH
 
NO. 2-04-130-CR
 
  
CHRISTOPHER 
DAVID COURSON                                            APPELLANT
 
V.
 
THE 
STATE OF TEXAS                                                                  STATE
 
 
------------
 
FROM 
THE 362ND DISTRICT COURT OF DENTON COUNTY
 
------------
 
OPINION
 
------------
        Appellant 
Christopher David Courson was convicted of causing injury to a child with a 
deadly weapon, his hands, and sentenced to ninety-nine years’ 
confinement.  On appeal, Appellant challenges the legal and factual 
sufficiency of the evidence supporting his conviction and the trial court’s 
denial of his motion for new trial.  We will affirm.
I. FACTUAL BACKGROUND
        Appellant 
brought his six-month-old daughter, Kylie, to Medical Center of Lewisville’s 
emergency room on June 27, 2003 in a comatose state. A hospital volunteer 
testified that Appellant at first told her that he fell while he was taking a 
shower with Kylie; later he told her that Kylie fell out of his arms and landed 
on her side. The emergency room physician who treated Kylie testified that 
Appellant said he had been carrying Kylie in his arms when she fell out of his 
arms and landed on the floor. The police officer who first arrived at the 
hospital testified that Appellant said he had been taking a shower with Kylie, 
that he slipped and fell as he stepped out of the shower, and that Kylie 
“squirted up out” of his arms as he fell. After initially being treated at 
Lewisville, Kylie was later transferred to Children’s Medical Center of Dallas 
(“Children’s”).
        Regarding 
Kylie’s injuries, child neurologist Jay Cook, M.D. testified that Kylie had 
broken blood vessels in her eyes and indications of cerebral pressure, both of 
which indicated shaken baby syndrome. Kylie’s CT scan showed that she also had 
subdural hematomas on both sides of the brain. Dr. Cook explained that subdural 
hematomas can be caused by anything that moves the head forward and backward. 
Dr. Cook also testified that if a child were injured by falling down and hitting 
her head, she would exhibit other signs of trauma; in contrast, if a child were 
injured by shaking, there would be no additional signs other than handprints on 
the chest. Dr. Cook noted that a chest x-ray showed that Kylie had a rib 
fracture that was at least two weeks old.
        Dr. 
Cook further testified that Kylie’s CT scan showed that her brain had suffered 
at least two traumatic events; one occurred in the twenty-four-hour period 
before Kylie was brought to the hospital, and the other had occurred some time 
before that. Dr. Cook also testified that Kylie suffered two skull fractures and 
that these had been caused by some external force, such as a fall. However, he 
explained that Kylie suffered injuries throughout her brain, not in just one 
location, and that this diffuse brain damage was not the type of injury that 
would result from a fall.
        Travis 
Kevin Lilly, M.D., the emergency room physician who first treated Kylie, 
testified that she had suffered at least two incidents of trauma as shown by her 
retinal hemorrhages, a hallmark of shaken baby syndrome, and skull fractures; 
however, he could not date the age of the retinal hemorrhages. He noted that 
Kylie had no bumps or bruises on her head or face to indicate that she had 
fallen out of Appellant’s arms that morning. He also stated that rib fractures 
do not occur every time a baby is shaken.
        Dr. 
Lilly further testified that the CT scan showed “acute,” or new, bleeding in 
Kylie’s brain that had occurred sometime within the previous twenty-four 
hours. He testified that Kylie also had two “subacute,” or old, areas of 
bleeding called hematomas, one on each side of the front part of her brain; the 
one on the left was twenty-four to forty-eight hours old, and the one on the 
right was two to three days old. Dr. Lilly stated that a “significant force” 
to the head could have caused the old hematomas to bleed again, but he explained 
that the acute blood appeared towards the back of Kylie’s brain, while the old 
hematomas were in the front of her brain. Nancy McNeil, a pediatric nurse 
practitioner, also testified that old hematomas can leak new blood, but this new 
blood would not necessarily show up as a new hemorrhage on a CT scan. Nurse 
McNeil further testified that a sudden onset of symptoms such as 
unresponsiveness would not result from a “rebleed” of an old hematoma; 
rather, it would be the result of another, acute incident.
        Peter 
Luckett, M.D., the physician in charge of the Children’s trauma unit at the 
time Kylie was admitted, testified that he questioned Kylie’s family about her 
health history in an effort to ascertain the cause of her condition. He reported 
that the family told him that Kylie had been “completely, entirely normal” 
before the day she was taken to the emergency room and that there was no reason 
to believe that there was anything wrong with her. Dr. Luckett testified that 
because Kylie was brought to the hospital near death but was normal before that, 
it was an “acute, catastrophic event” that caused her symptoms that day. He 
also testified that Kylie suffered from shaken baby syndrome and that a baby who 
had been shaken would not necessarily have any bruises on her chest and back.
        Detective 
Eddie Barrett testified that he spoke with Appellant at the hospital while 
investigating Kylie’s injuries, and Appellant said that he was Kylie’s 
primary caregiver and that Kylie had been with him Wednesday and Thursday, the 
two days before he brought her to the ER. Appellant testified that he took care 
of Kylie during the day on Wednesday and Thursday but that he could not remember 
what he did during those evenings. He admitted that he was in the apartment 
Thursday evening with Kylie and Morgan, Kylie’s mother, but that he “might 
have left to go to the store or something” for a “[p]ack of cigarettes or 
something.”
        Detective 
Barrett also testified that when he searched Appellant’s home after speaking 
with Appellant at the hospital, he noticed that even though Appellant claimed 
that the fall happened as he stepped out of the shower, none of the rubber toys 
sitting on the edge of the shower’s bathtub had been knocked over or 
disturbed. Based on the small size of the bathroom, Detective Barrett also 
doubted that Appellant, contrary to his story, could have fallen without hitting 
something such as the toilet seat or counter.
II. LEGAL AND FACTUAL SUFFICIENCY OF THE EVIDENCE
        In 
his brief, Appellant does not dispute that Kylie had shaken baby syndrome. 
Instead, he argues that because the medical evidence did not pinpoint the exact 
time that Kylie’s injuries occurred, the State did not prove that he was the 
only person with access to Kylie who could have harmed her. Appellant points to 
Kylie’s old rib fracture and the lack of handprints on her chest as evidence 
that she was not injured when she was alone with Appellant that morning, and he 
claims that “[t]here is no evidence that anything happened to Kylie on the 
27th of June 2003 other than all the injuries caught up with her and she became 
symptomatic.”
        However, 
the State presented testimony from doctors that Kylie’s brain had suffered a 
traumatic event in the twenty-four-hour period before Appellant brought her to 
the hospital. There was also testimony that the new blood did not appear in the 
same area of Kylie’s brain as the old hematomas, that Kylie’s severe 
symptoms would not have resulted merely from a “rebleed” of these old 
hematomas, that Kylie’s sudden decline from a normal state to a comatose state 
showed that she had suffered a new, “catastrophic” trauma, and that a 
shaking episode would not necessarily cause bruising or broken ribs. 
Accordingly, the jury could rationally have concluded that Kylie suffered 
serious bodily injury within the twenty-four-hour time period before Appellant 
took Kylie to the hospital and not merely that some old injuries became 
symptomatic, as Appellant argues.
        Furthermore, 
the State was required to prove that Appellant was responsible for causing 
serious bodily injury to Kylie, not that he had exclusive possession of her for 
an indeterminate time period before taking her to the emergency room. See 
Tex. Penal Code Ann. § 
22.04(a)(1) (Vernon 2003). The evidence showed that Appellant was Kylie’s 
primary caregiver, and it further showed that Appellant was with Kylie for at 
least the twenty-four hour period before he brought her to the hospital. 
Appellant testified that he may have left Kylie at the apartment with her mother 
the night before “to go to the store or something” and that he could not 
remember what he did the night before that, but the jury was free to disbelieve 
Appellant’s testimony. See Barnes v. State, 876 S.W.2d 316, 321 (Tex. 
Crim. App.) (“The jury is the exclusive judge of the credibility of witnesses 
and of the weight to be given their testimony.”), cert. denied, 513 
U.S. 861 (1994). Likewise, the jury was free to reject any implication that some 
other, unnamed person could have caused Kylie’s injuries in light of all the 
evidence presented at trial. See Zuniga v. State, 144 S.W.3d 477, 483 
(Tex. Crim. App. 2004) (stating that the jury, not the reviewing court, has the 
responsibility of accepting or rejecting alternative theories of causation); Johnson 
v. State, 871 S.W.2d 183, 186 (Tex. Crim. App. 1993) (holding that, in a 
circumstantial evidence case, “it is not necessary that every fact point 
directly and independently to the defendant’s guilt; it is enough if the 
conclusion is warranted by the combined and cumulative force of all the 
incriminating circumstances”), cert. denied, 511 U.S. 1046 (1994).
        Accordingly, 
after examining the evidence under the applicable legal[1] 
and factual[2] sufficiency standards of review, we 
conclude that the jury was rationally justified in finding appellant’s guilt 
beyond a reasonable doubt. We overrule Appellant’s first and second issues.
III. WITNESS CONFRONTATION
        In 
his third issue, Appellant argues that the trial court erred in denying his 
motion for new trial because admission of hearsay statements made by his wife, 
Morgan, to police after a domestic dispute between Morgan and Appellant violated 
his federal constitutional right to confront witnesses against him. See Crawford 
v. Washington, ___ U.S. ____, 124 S. Ct. 1354, 1374 (2004). However, the 
record does not reflect that Appellant raised any objection at trial to the 
admission of these statements.
        To 
preserve a complaint for our review, a party must have presented to the trial 
court a timely and specific objection to the complained-of testimony. See 
Tex. R. App. P. 33.1(a)(1); Mosley 
v. State, 983 S.W.2d 249, 265 (Tex. Crim. App. 1998) (op. on reh’g), cert. 
denied, 526 U.S. 1070 (1999). Appellant claims that because Crawford v. 
Washington was handed down during his trial, the only way to cure the error 
was through a motion for new trial. We review the trial court’s decision to 
deny Appellant’s motion for new trial under an abuse of discretion standard. Lewis 
v. State, 911 S.W.2d 1, 7 (Tex. Crim. App. 1995); Jackson v. State, 
139 S.W.3d 7, 13 (Tex. App.—Fort Worth 2004, pet. ref’d).
        In 
Crawford v. Washington, the Supreme Court held that testimonial hearsay 
statements are subject to the requirements of witness unavailability and a prior 
opportunity for cross-examination contained in the Sixth Amendment’s 
Confrontation Clause, regardless of whether such statements are deemed reliable 
by the trial court. 124 S. Ct. at 1374. In so holding, the Court abrogated its 
earlier decision in Ohio v. Roberts, 448 U.S. 56, 100 S. Ct. 2531 (1980), 
as applied to testimonial hearsay statements. See Crawford v. Washington, 
124 S. Ct. at 1374. However, Crawford v. Washington makes clear that the 
federal constitutional right to confront one’s accusers is neither new nor 
novel. See id.; Bunton v. State, 136 S.W.3d 355, 369 (Tex. 
App.—Austin 2004, pet. ref’d). Accordingly, Appellant was well aware at the 
time the State elicited testimony regarding Morgan’s hearsay statements of his 
right to confront witnesses against him as well as the necessity of objecting at 
trial to the admission of these statements without his having had the 
opportunity to examine Morgan regarding the statements. See Wright v. State, 
28 S.W.3d 526, 536 (Tex. Crim. App. 2000) (holding that an objection at trial is 
required to preserve error on Confrontation Clause grounds), cert. denied, 
531 U.S. 1128 (2001).
        An 
objection must be made as soon as the basis for the objection becomes apparent. Lagrone 
v. State, 942 S.W.2d 602, 618 (Tex. Crim. App.), cert. denied, 522 
U.S. 917 (1997); Wilson v. State, 44 S.W.3d 602, 606 (Tex. App.—Fort 
Worth 2001, pet. ref’d). The purpose of lodging a timely and specific 
objection is to inform the trial court of the basis of the objection and to give 
the court an opportunity to rule on the specific objection as the evidence is 
introduced. Aguilar v. State, 26 S.W.3d 901, 906 (Tex. Crim. App. 2000). 
Accordingly, because Appellant failed to advance his Confrontation Clause 
objection to the hearsay testimony until after the conclusion of the trial, 
Appellant’s objection was untimely. As a result, Appellant forfeited his 
complaint that the hearsay testimony violated his federal constitutional right 
to confront witnesses against him. See Oveal v. State, No. 
14-02-01089-CR, 2004 WL 2812842, at *1 (Tex. App.—Houston [14th Dist.] Dec. 9, 
2004, no pet. h.) (holding that appellant failed to preserve his Confrontation 
Clause complaint under Crawford v. Washington by failing to object at 
trial); Crawford v. State, 139 S.W.3d 462, 464 (Tex. App.—Dallas 2004, 
pet. ref’d) (same); Bunton, 136 S.W.3d at 369 (same). Therefore, the 
trial court did not abuse its discretion in denying Appellant’s motion for new 
trial. We overrule Appellant’s third issue.
IV. CONCLUSION
        Having 
overruled all Appellant’s issues on appeal, we affirm the trial court’s 
judgment.
   
  
                                                          BOB 
MCCOY
                                                          JUSTICE
  
   
PANEL 
F:   LIVINGSTON, DAUPHINOT, and MCCOY, JJ.
  
PUBLISH
  
DELIVERED: 
February 3, 2005

 
NOTES
1.  
See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Ross 
v. State, 133 S.W.3d 618, 620 (Tex. Crim. App. 2004).
2.  
See Zuniga v. State, 144 S.W.3d at 481; King v. State, 29 S.W.3d 
556, 565 (Tex. Crim. App. 2000); Kutzner v. State, 994 S.W.2d 180, 184 
(Tex. Crim. App. 1999).