Opinion filed February 2, 2006












 
 
  
 
 







 
 
  
 
 




Opinion filed February 2, 2006

 

 

 

 

 

 

                                                                        In The

                                                                              

    Eleventh Court of Appeals

                                                                   __________

 

                                                          No. 11-04-00250-CR 

                                                    __________

 

                              JOE THOMAS FITZGERALD, Appellant

 

                                                             V.

 

                                        STATE
OF TEXAS, Appellee

 



 

                                         On
Appeal from the 266th District Court

 

Erath County, Texas

 

Trial Court Cause No. 11880

 



 

O P I N I O N

 

The jury convicted Joe Thomas Fitzgerald of the
second degree felony offense of aggravated assault with a deadly weapon.  Appellant pleaded true to an enhancement
allegation, and the jury assessed punishment at twelve years imprisonment.  In two appellate issues, appellant challenges
the factual sufficiency of the evidence to support his conviction.  We affirm. 

                                                               Background
Facts








 The
indictment alleged that appellant intentionally or knowingly threatened Deanna
Michelle Carver with imminent bodily injury and that appellant used or
exhibited a deadly weapon, namely a knife, during the commission of the
assault.  In his issues, appellant
contends that the evidence was factually insufficient to prove that he
knowingly or intentionally threatened Carver with imminent bodily injury.

        
                                                     Standard
of Review

To determine if the evidence is factually
sufficient, we must review all of the evidence in a neutral light and determine
whether the evidence supporting guilt is so weak that the verdict is clearly
wrong and manifestly unjust or whether the evidence contrary to the verdict is
so strong that the beyond-a-reasonable-doubt burden of proof could not have
been met.  Zuniga v. State, 144
S.W.3d 477 (Tex. Crim. App. 2004); Ross v. State, 133 S.W.3d 618
(Tex. Crim. App. 2004); Vasquez v. State, 67 S.W.3d 229, 236 (Tex. Crim.
App. 2002); Cain v. State, 958 S.W.2d 404 (Tex. Crim. App. 1997); Clewis
v. State, 922 S.W.2d 126 (Tex. Crim. App. 1996).  The jury, as the trier of fact, is the sole
judge of the credibility of the witnesses and of the weight to be given to
their testimony.  Tex. Code Crim. Proc. Ann. 
art. 36.13 (Vernon 1981), art. 38.04 (Vernon 1979).  The jury may choose to believe or disbelieve
all or any part of any witness=s
testimony.  Sharp v. State, 707
S.W.2d 611, 614 (Tex. Crim. App. 1986). 
The jury may accept one version of the facts and reject another.  Penagraph v. State, 623 S.W.2d 341,
343 (Tex. Crim. App. 1981).

                                                                   The
Evidence

The State called six witnesses during the
guilt/innocence phase of the trial.  The
witnesses included: (1) Carver, the victim; (2) Joni Thompson, an acquaintance
of Carver; (3) John Paul Fitzgerald, appellant=s
brother; (4) Thomas Ray Green, a deputy with the Erath County Sheriff=s Department; (5) Marty Golightly, a
deputy with the Erath County Sheriff=s
Department; and (6) Clayton Hollifield, a deputy with the Erath County Sheriff=s Department.

Carver=s
Testimony  








Carver testified that appellant had been her
on-again, off-again boyfriend for three years. 
She said that they had very strong feelings for each other.  During the evening of October 7, 2003, Carver
and Thompson went to a bar in Stephenville. 
Carver said that Thompson had been doing drugs that day.  Carver testified that appellant showed up at
the bar.  Carver said that appellant got
angry and left the bar but came back in saying that he had locked himself out
of his car and that he needed a ride home. 
Carver agreed to give appellant a ride to his house, and Thompson
accompanied Carver and appellant during the ride.  The record shows that appellant lived in a
house in Selden.

Appellant and Carver argued and yelled at each
other during the trip.  Carver told
appellant that she was ending their relationship.  Appellant asked Carver to come inside his
house so that he could talk with her. 
Carver agreed and went inside the house, while Thompson waited outside
in the car.  Carver said that appellant=s brother, John Paul Fitzgerald, was
inside the house.

Carver and appellant went into appellant=s bedroom.  They continued to argue, and Carver testified
that appellant threatened to kill himself. 
Carver said that she also threatened to kill herself. Carver testified
that she went to the kitchen and got two knives.  Carver said that State=s
Exhibit Nos. 1 and 2 were the knives that she retrieved from the kitchen.  Both of the knives had black handles.  One of the knives was longer than the other
knife.  Carver said that appellant took
the knives away from her and cut himself in the arm and chest.  She testified that appellant had a really bad
temper and bad mood swings.  Appellant
was so upset that Carver thought he might try to kill himself.

Carver testified that appellant would not let her
leave the house.  She tried to kick out a
bedroom window, but appellant picked her up and put her on the bed.  Carver tried to make a phone call, but
appellant ripped the phone out of his bedroom wall.  Carver was scared and did not know what was
going to happen.  She said that appellant
was holding the knives close to her in a threatening manner.  Carver said that appellant could have gotten
to her with the knives and that the knives were deadly.  However, Carver also testified that appellant
never verbally threatened her and that she knew appellant would not hurt her
because he loved her so much.

Carver yelled at appellant=s
brother (John) to go outside and get Thompson. 
Thompson came into the house.  At
one point, appellant told John to get a gun that was behind some railing in a
closet.  However, John never got a gun,
and Carver said she never saw a gun at the house.  Carver testified that appellant never
threatened Thompson and eventually let Thompson leave.  Appellant told Thompson that she better not
call the police.








Later, Carver saw police lights outside of the
house.  She said that she pushed the
front door open and ran outside.  Carver
told the police that she did not want to press charges against appellant. She
also said that she did not want to testify in the case.  She signed an affidavit of non-prosecution
and wrote a letter stating that she wanted the case against appellant
dropped.  Carver testified that, while
she still loved appellant and would do anything for him, she would not lie for
him in court. Thompson=s
Testimony

Thompson testified that she was currently serving
a sixteen-month sentence for theft.  She
said that she met appellant for the first time on the night of the
incident.  At that time, Thompson was
serving probation for fifteen different hot-check theft charges.  Thompson testified that she had not been
drinking and had not used any illegal drugs on the day of the incident.

Thompson confirmed Carver=s
testimony about the incident at the bar and the ride to appellant=s house.  She said that the Selden turnoff was about
ten miles from Stephenville.  Thompson
waited outside appellant=s
house when Carver went inside with appellant. 
After about twenty or thirty minutes, John came out of the house and got
Thompson.  Thompson went inside the house
and heard appellant and Carver arguing and screaming at each other.  Thompson said that appellant had knives in
both of his hands.  She said that one of
the knives had a long blade and that the other knife had a short blade.  Carver was terrified and kept trying to leave
the house, but appellant would not let her go. 
Thompson testified that appellant was very angry, very upset, and
belligerent.  Thompson said that appellant
kept screaming at Carver, saying that he was going to kill her and
himself.  Appellant said that, if Carver
was not going to be with him, she was not going to be with anyone.  Thompson convinced appellant to let her leave
to see her roommate.  Appellant told her
to come straight back; and, if she brought the police or anyone else with her,
he would shoot them all.  Appellant
indicated that there was a gun in the bedroom closet, and Thompson said that
she saw a rifle in the closet.

Thompson said that she got in Carver=s car and headed to the Sheriff=s Department in Stephenville.  Thompson said that a DPS Trooper pulled her
over for speeding.  She told the trooper
about what was going on at appellant=s
house.

John=s
Testimony








John testified that Carver and appellant came
inside the house and then started arguing with each other.  He said that appellant had a bad temper and
became very angry.  Appellant was out of
his mind and going crazy.  John said that
appellant went to the kitchen and got the knives from the drawer.  Appellant was irate and was waiving the
knives around.  John did not know what
appellant was going to do with the knives. 
He said that appellant=s
actions with the knives threatened everyone in the house.  Carver looked like she was having an anxiety
attack.

John testified that the telephone rang, and he
answered it.  A police officer was on the
line. John snuck out of the front door of the house to meet the officer.  John told the officer that appellant was going
to kill himself or Carver.

Deputy Green=s
Testimony

Deputy Hollifield called Deputy Green and told him
that an assault was taking place at a house on the Moncrief Dairy in
Selden.  Deputy Green drove to the
scene.  Deputy Green testified that
Carver ran out of the house.  Carver was
upset and crying.  Appellant came out of
the house, and Deputy Green took him into custody.  Deputy Green said  that appellant had some cuts on his wrist.
Deputy Green testified that Deputy Hollifield and Deputy Golightly found two
knives in the back bedroom of the house. 
Deputy Green said that State=s
Exhibit Nos. 1 and 2 were steak knives and that they were deadly weapons.

Deputy Golightly=s
Testimony

Deputy Golightly was working with Deputy
Hollifield on the night of the incident. 
They received a call from Trooper Lopez requesting assistance in a
traffic stop involving Thompson.  After
talking with Thompson, Deputy Golightly and Deputy Hollifield headed to
appellant=s house. 

As they drove up to the house, John came out of
the house.  Deputy Golightly said that
John was upset and frightened.  John told
the officers, A[Y]ou=ve got to get in there . . . he=s going to kill her or himself.@ 
Carver and appellant came out of the house.  Carver was crying, and she was very
upset.  Deputy Golightly took appellant
to the hospital for treatment of self-inflicted wounds to the chest and
arms.  After appellant was discharged
from the hospital, Deputy Golightly took him to jail. Deputy Golightly said
that the officers did not find any guns in the house.

Deputy Hollifield=s
Testimony








Trooper Lopez contacted Deputy Hollifield
requesting assistance with the traffic stop of Thompson.  Thompson told Deputy Hollifield that an
assault had been committed at appellant=s
house.  Deputy Hollifield and Deputy
Golightly headed toward appellant=s
house.  Appellant lived in a house on the
Moncrief Dairy in Selden.  Deputy
Hollifield obtained a phone number for appellant=s
house.  He called the number and spoke
with John.  As Deputy Hollifield pulled
up into the driveway of the residence, John came out of the residence.  John seemed to be upset or scared.  John told Deputy Hollifield that appellant
was going to kill Carver or himself. 
Then, Carver and appellant came out of the house.  Carver was crying and upset, almost to the
point of being hysterical.  The officers
placed appellant into custody.  Deputy
Hollifield and Deputy Golightly went inside the house to make sure that no one
was hiding inside and to look for physical evidence.  They found two knives in the back
bedroom.  They looked in the closets for
other weapons but did not find any. 
Deputy Hollifield said that he would feel threatened if someone was
holding the knives within striking distance of him.

Aggravated Assault by Threat

A person commits the offense of assault if he
intentionally or knowingly threatens another with imminent bodily injury.  Tex.
Pen. Code Ann. '
22.01(a)(2) (Vernon Supp. 2005).  An
assault becomes aggravated if the person uses or exhibits a deadly weapon
during the commission of the assault. Tex.
Pen. Code Ann. '
22.02(a)(2) (Vernon Supp. 2005).  Assault
by threat under Section 22.01(a)(2) is a Anature-of-conduct@ offense unlike assault under Tex. Pen. Code Ann. ' 22.01(a)(1) (Vernon Supp. 2005) where
a defendant actually causes bodily injury. 
In the Matter of S.B., 117 S.W.3d 443, 450 (Tex. App.CFort Worth 2003, no pet.); Guzman v.
State, 988 S.W.2d 884, 887 (Tex. App.CCorpus
Christi 1999, no pet.).  The focus is not
on a victim=s
perception but upon whether a defendant intentionally or knowingly caused the
victim a reasonable apprehension of imminent bodily injury.  In the Matter of S.B., 117 S.W.3d at
450.  

Intent or knowledge may be inferred from the acts,
words, and conduct of an accused at the time of an offense.  Hart v. State, 89 S.W.3d 61, 64 (Tex.
Crim. App. 2002).  A threat may be
communicated by action, conduct, or words. 
McGowan v. State, 664 S.W.2d 355, 356 (Tex. Crim. App.
1984).  A person acts intentionally with
respect to his conduct or to a result of his conduct when it is his conscious
objective or desire to engage in the conduct or cause the result.  Tex.
Pen. Code Ann. '
6.03(a) (Vernon 2003).  A person acts
knowingly with respect to the nature of his conduct or to the circumstances
surrounding his conduct when he is aware of the nature of his conduct or that
the circumstances exist.  Tex. Pen. Code Ann. ' 6.03(b) (Vernon 2003).  Additionally, a person acts knowingly with
respect to a result of his conduct when he is aware that his conduct is
reasonably certain to cause the result. 
Section 6.03(b).








                                                                        Analysis

The State had the burden to prove beyond a
reasonable doubt that appellant knowingly or intentionally threatened Carver
with imminent bodily injury.  In his
first issue, appellant argues that the evidence was too weak to support a
finding of guilt.  Appellant contends
that Thompson=s
testimony was the only direct evidence that appellant threatened Carver with
imminent bodily injury. Thompson testified that appellant kept screaming at
Carver that he was going to kill her. 
Appellant attacks Thompson=s
credibility and asserts that her testimony was too weak to support a finding of
guilt based on the following reasons: (1) she was a convicted felon; (2) her
testimony was directly contradicted by Carver=s
testimony that appellant did not verbally threaten Carver; and (3) she
embellished and exaggerated details about the incident during her testimony.

Thompson=s
testimony was not the only evidence that appellant threatened Carver with
imminent bodily injury.  The State=s evidence established that appellant
held and waived the knives in close proximity to Carver.  Appellant was irate, upset, angry, and going
out of his mind.  Although Carver
testified that appellant never verbally threatened her, Carver also testified
that appellant held the knives close to her in a threatening manner.  John testified that appellant=s actions with the knives threatened
everyone in the house.  The evidence also
showed that appellant would not let Carver leave the house.  John told the police that appellant was going
to kill Carver or himself.  The evidence
supported a finding that appellant intentionally or knowingly threatened Carver
with imminent bodily injury, and the evidence was not so weak that the verdict
was clearly wrong and manifestly unjust.

Additionally, the jury, as the sole judge of the
credibility of the witnesses and of the weight to be given their testimony, was
entitled to accept Thompson=s
testimony that appellant verbally threatened Carver and to reject Carver=s testimony that appellant did not
verbally threaten her. Penagraph, 623 S.W.2d at 343.  Appellant=s
first issue is overruled.








In his second issue, appellant argues that the
evidence contrary to the verdict was so strong that the
beyond-a-reasonable-doubt burden of proof could not have been met.   Appellant relies on Carver=s testimony that appellant never
threatened her and John=s
testimony that he did not recall appellant threatening Carver.  However, even if appellant never verbally
threatened Carver, the evidence supported a finding that appellant threatened
Carver by his actions and conduct. 
Appellant held and waived the knives while very close to Carver.  The evidence contrary to the verdict was not
so strong that the beyond-a-reasonable-doubt burden of proof could not have
been met.  Appellant=s second issue is overruled.

                                                               This
Court=s Ruling

The judgment of the trial court is affirmed.   

 

TERRY McCALL

JUSTICE

 

February 2, 2006

Do not publish.  See
Tex. R. App. P. 47.2(b).

Panel
consists of:  Wright, C.J., and

McCall,
J., and Strange, J.