IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. 74,459




 


VAUGHN ROSS, Appellant



v.



THE STATE OF TEXAS





ON DIRECT APPEAL


FROM LUBBOCK COUNTY





 

 Hervey, J., delivered the opinion of the Court in which Meyers, Price,
Womack, Johnson, Keasler, Holcomb and Cochran, JJ., joined. Keller, PJ.,
concurred.


O P I N I O N



 A jury convicted appellant of capital murder. The trial court sentenced appellant to death pursuant
to the jury's answers to the special issues submitted at the punishment phase. Appellant raises seventeen
points of error. We affirm.

 Appellant claims that the evidence is legally insufficient (point of error eleven) and factually
insufficient (point of error twelve) to support his conviction. In a legal sufficiency review, we view all of the
evidence in the light most favorable to the verdict and then determine whether a rational trier of fact could
have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 99
S.Ct. 2781, 2789 (1979). In a factual sufficiency review, we view all of the evidence in a neutral light, and
we will set the verdict aside only if the evidence is so weak that the verdict is clearly wrong and manifestly
unjust, or the contrary evidence is so strong that the standard of proof beyond a reasonable doubt could
not have been met. See Zuniga v. State, S.W.3d slip op. at 8 (Tex.Cr.App. No. 539-02, delivered
April 21, 2004).

 The indictment alleged that appellant murdered more than one person during the same criminal
transaction. The evidence shows that appellant's victims (Viola Ross and Douglas Birdsall) were apparently
murdered in Birdsall's car in an alley outside appellant's apartment complex. Appellant's neighbor reported
hearing gunshots in the alley at around 10:00 p.m. The victims' bodies were discovered in Birdsall's car,
which was parked in a ravine approximately 4.2 miles from the alley where the victims were murdered. 
Inside the car were shell casings, glass shards, and a fingertip piece of a latex glove. Shortly before the
murders, appellant's girlfriend (Liza, who was also Viola's sister) saw appellant wearing latex gloves. 
Appellant told Liza to leave the apartment so she would not be there "if anything happens." Liza left the
apartment and walked to her father's house, arriving at about 10:11 p.m. 

 In the alley outside appellant's apartment complex, the police discovered blood stains, glass shards
and a shell casing. Testing revealed that the glass shards were similar to the glass windows of Birdsall's
car. Additionally, the shell casing from the alley was tested and determined to be consistent with the shell
casings in Birdsall's car. The day after the murders, appellant accompanied Liza to the police station to
describe events of the previous night. Appellant told police he had argued with Viola over the telephone. 
During a second interview with police, appellant told an investigator that he and Viola did not get along and
that they had argued because Viola kept calling and putting Liza's ex-boyfriend on the phone. Appellant
consented to a police search of his apartment, which resulted in the recovery of two latex gloves and a
sweatshirt. DNA testing showed that a blood stain on the sweatshirt belonged to Birdsall. DNA testing
also showed that Birdsall's blood was on the outside of the latex glove tip found in Birdsall's car and that
appellant's DNA was on the inside of the glove tip. Appellant incriminated himself during police
questioning when asked about the location of the murder weapon, and again in a conversation with his
mother recorded at the Lubbock County Jail.

 The evidence is legally and factually sufficient to support appellant's conviction. The murders
occurred in an alley very near appellant's apartment. Appellant threatened Viola with violence not long
before she was murdered. Shortly before the murders, appellant told Liza to leave appellant's apartment
because he did not want her there in case anything happened. Liza also saw appellant wearing latex gloves,
and a latex glove tip containing appellant's DNA and Birdsall's blood was found inside Birdsall's car. 
Birdsall's blood was also on appellant's sweatshirt. Appellant incriminated himself when the police asked
him about the murder weapon, and he incriminated himself to his mother. We cannot conclude that the
jury's verdict is irrational or clearly wrong and unjust. Points of error eleven and twelve are overruled.

 In point of error thirteen, appellant claims that the evidence is legally insufficient to support the
jury's finding that there is a probability that appellant would commit criminal acts of violence that would
constitute a continuing threat to society. We apply the Jackson v. Virginia standard in determining
whether the evidence is sufficient to support this finding. See Allridge v. State, 850 S.W.2d 471, 487
(Tex.Cr.App. 1991), cert. denied, 114 S.Ct. 101 (1993).

 At the punishment phase, the prosecution presented evidence that appellant has had problems
controlling his anger and that in 1997 appellant stabbed a girlfriend and stole her car, for which appellant
received and completed probation. Appellant completed an anger management course as a condition of
this probation.

 The State claims that the evidence presented at guilt/innocence and at punishment clearly establishes
appellant's "escalating pattern of violence." Appellant claims that the circumstances of the offense and
other evidence relative to his past indicate that he "is not likely to be a danger in the future." Appellant
argues that the evidence shows that he committed the murders under a "distressed" state of mind because
of having received a number of irritating phone calls from Viola. The evidence indicates that during these
phone calls appellant and Viola argued and Liza spoke with at least one of her other boyfriends, who
referred to appellant as a coward. (1) Appellant and Liza also argued. Appellant presented the testimony
of several witnesses who characterized appellant as an educated, responsible, peaceful, nonuser of drugs
or alcohol. Appellant argues:

 Appellant's state of mind at the time of the commission of the offense can best be
characterized as distressed. He had been the recipient of a number of phone calls from
[Viola] directed to [Liza]. During these calls [Liza]'s other boyfriends conversed with her.
[Appellant] had been called a coward by one of the male callers and his girlfriend had left
his apartment after an argument. If we assume that [the victims] drove to Appellant's
home to pick [Liza] up, per her request, the shooting cannot be seen as anything but a
reaction, not the result of a scheme. There is no evidence that Appellant did anything to
get [the victims] to come to his home. This indicates an absence of forethought. Appellant
had been on probation for assault in the past and had successfully completed the term. 
Appellant was 29 years old. He had completed college, earning a degree in architecture. 
He had maintained employment with an architecture firm until he decided to return to
school. Even as he worked toward an advanced degree, he worked. There is no
evidence that Appellant was under duress or under the domination of another at the time
of the offense. Finally, there was no psychiatric evidence or testimony from witnesses who
claimed that Appellant's character was bad.


 We do not agree that the evidence "indicates an absence of forethought" and that appellant's
commission of this offense "cannot be seen as anything but a reaction." The evidence that, shortly before
the murders and after appellant had threatened Viola, appellant put on latex gloves and asked Liza to leave
his apartment in case anything happened supports a finding that appellant planned to murder at least Viola. 
See Keeton v. State, 724 S.W.2d 58, 61 (Tex.Cr.App. 1987) (some factors relevant to "future
dangerousness" special issue are the calculated nature of the defendant's acts and the forethought and
deliberateness exhibited by the crime's execution).

 A rational jury could also have found that Birdsall was an unintended victim and that appellant
intentionally murdered him for no other reason than that Birdsall was in the wrong place at the wrong time. 
See id. (circumstances of the offense is another factor relevant to the "future dangerousness" special issue). 
That Viola was the sister of appellant's girlfriend (Liza) is also a relevant consideration to the "future
dangerousness" special issue. See id. Another relevant consideration is that appellant murdered the victims
out of anger not long after completing an anger management course as a condition of probation for another
violent assaultive offense. Appellant's criminal behavior does establish an escalating rather than a de-escalating pattern of violence.

 On this record, a jury could rationally have found that there is a probability that appellant would
commit criminal acts of violence that would constitute a continuing threat to society. Point of error thirteen
is overruled.

 In points of error one through six, appellant claims that portions of the parole charge at the
punishment phase of his trial violated several federal constitutional provisions and Article 37.071, §
2(e)(2)(B), of the Texas Code of Criminal Procedure. In accordance with Article 37.071, § 2(e)(2)(B),
the trial court should have submitted the following parole charge at the punishment phase:

 Under the law applicable in this case, if the defendant is sentenced to imprisonment in the
institutional division of the Texas Department of Criminal Justice for life, the defendant will
become eligible for release on parole, but not until the actual time served by the defendant
equals 40 years, without consideration of any good conduct time. It cannot accurately be
predicted how the parole laws might be applied to this defendant if the defendant is
sentenced to a term of imprisonment for life because the application of those laws will
depend on decisions made by prison and parole authorities, but eligibility for parole does
not guarantee that parole will be granted.


 The record, however, reflects that the trial court submitted this parole charge at the punishment
phase:

 Under the law applicable in this case, the defendant, if sentenced to a term of life
imprisonment, may earn time off the period of incarceration imposed through the
award of good conduct time. Prison authorities may award good conduct time to
a prisoner who exhibits good behavior, diligence in carrying out prison work
assignments, and attempts rehabilitation. If a prisoner engages in misconduct,
prison authorities may also take away all or part of any good conduct time earned
by the prisoner.[ (2)]


 It is also possible that the length of time for which the defendant will be imprisoned on a
life sentence might be reduced by the award of parole.


 Under the law applicable in this case, if the defendant is sentenced to a term of
imprisonment in the Institutional Division of the Texas Department of Criminal Justice for
life, he will not become eligible for parole until the actual calendar time served without
consideration of good conduct time, equals forty calendar years. Eligibility for parole does
not guarantee that parole will be granted.


 It cannot accurately be predicted how the parole law and good conduct time might be
applied to this defendant if he is sentenced to a term of imprisonment for life, because the
application of these laws will depend on decisions made by prison and parole
authorities.[ (3)]


 You may consider the existence of the parole law and good conduct time. 
However, you are not to consider the extent to which good conduct time may be
awarded or forfeited by this particular defendant.[ (4)]


 Appellant argues, as he did at trial, that the bolded portions of this charge could have misled the
jury into believing that appellant might be eligible for parole in less than forty years. The State concedes
that the parole charge should not have included the good conduct time language but argues that appellant
was not harmed by the parole charge.

 We agree that the parole charge was erroneous since it does not comply with Article 37.071, §
2(e)(2)(B). The charge did instruct the jury that a life-sentenced appellant would not be eligible for parole
for forty years "without the consideration of good conduct time," therefore we doubt that the bolded
portions of the charge could have misled the jury into believing that appellant might be eligible for parole
in less than forty years through the award of good conduct time. The issue that is dispositive of appellant's
state-law and federal constitutional law claims is whether the jury was so misled or whether there is a
reasonable likelihood that the jury applied the misleading parole charge in a way that prevented it from
considering that a life-sentenced appellant would not be eligible for parole for forty years. See Turner v.
State, 87 S.W.3d 111, 117 (Tex.Cr.App. 2002), cert. denied, 123 S.Ct. 1760 (2003); Luquis v. State,
72 S.W.3d 355, 366 (Tex.Cr.App. 2002); Smith v. State, 898 S.W.2d 838, 857-72 (Tex.Cr.App.)
(Clinton, J., dissenting), cert. denied, 116 S.Ct. 131 (1995) (explaining why a life-sentenced capital murder
defendant's minimum parole eligibility date could be considered mitigating); Almanza v. State, 686 S.W.2d
157, 171 (Tex.Cr.App. 1984) (op. on reh'g) (properly preserved error in jury charge requires reversal
if the defendant suffers some harm meaning that the error will call for reversal "as long as the error is not
harmless").

 In Luquis, we decided that a charge like the one here "which informs the jury of the existence of
good conduct time, briefly describes that concept, and explicitly tells the jury not to apply that concept to
the particular defendant" does not violate federal due process even "if the defendant's eligibility for parole
... will not be affected by good conduct time." See Luquis, 72 S.W.3d at 365. Though Luquis was a
noncapital case involving no jury charge error under state law, (5) its reasoning applies here. As in Luquis,
the potential harm that appellant faced from the misleading parole charge was the danger that the jury might
have effectively sentenced him to death "to compensate for what it could perceive as the possibility that he
might otherwise be released from prison too soon due to 'good conduct time.'" See Luquis, 72 S.W.3d
at 362; see also Smith, 898 S.W.2d at 864 (Clinton, J., dissenting) (minimum parole eligibility might be
viewed as mitigating because, among other things, a jury could view it as tending to minimize the possibility
of the defendant "ever constituting a threat, at least to the public at large").

 On this record, however, we do not find that the jury was so misled or that there is a reasonable
likelihood that the jury applied the misleading parole charge in a way that prevented it from considering that
a life-sentenced appellant would not be eligible for parole for 40 years. The parole charge informed the
jury that a life-sentenced appellant "may" be released from prison after forty years, not that he necessarily
would. See Luquis, 72 S.W.3d at 364, 366. The jury was instructed not to consider how good conduct
time might be applied to appellant, and there is no evidence in the record to rebut the presumption that the
jury followed this instruction. See Luquis, 72 S.W.3d at 366, 368. "Nothing in this record suggests that
the jury discussed, considered or tried to apply (despite the judicial admonition not to apply) what they
were told about good conduct time and parole." See Luquis, 72 S.W.3d at 367 (emphasis in original). 
"The jury did not send out any notes indicating or expressing confusion about the possible application of
good conduct time to appellant." See id. Finally, during closing jury arguments at punishment, appellant
informed the jury several times that a life-sentenced appellant would serve at least forty years in prison and
this was not disputed by the prosecution. See id. For example,

 Now, there's a lot of talk about what might happen forty years from now. But you all
know that that parole clock doesn't start ticking for forty years, calendar time, flat.


 So, when you're weighing what it is that we need to say [appellant] should live, we're
saying he is going to live, his quality of life is not going to be so good, and he's going to be
locked up, he's going to be watched, he's not going to be free to travel, but we'll let him
live because we think, with our values and our sense of humanity, we think that we don't
want to be a party to putting him to death.


 A lot can happen in forty years.


 We cannot conclude that there is a reasonable likelihood that the good conduct time language in
the parole charge misled the jury into believing that a life-sentenced appellant would be released from
prison in less than forty years. Appellant, therefore, suffered no harm from the erroneous jury charge. See
Luquis, 72 S.W.3d at 364-68; Almanza, 686 S.W.2d at 171. Points of error one through six are
overruled.

 In points of error seven and eight, appellant claims that the underlined portions of the parole charge
(set out above) violated various federal constitutional provisions and Article 37.071 because appellant did
not request them. These underlined portions of the parole charge tracked the language of Article 37.071,
§ (2)(e)(2)(B), though not in the exact order of the statute. Article 37.071, § (2)(e)(2)(A), of the Texas
Code of Criminal Procedure, requires the trial court to submit this parole charge "on the written request
of the attorney representing the defendant."

 Appellant claims that by "submitting the [underlined portions of the parole charge] without
Appellant's request, the [trial court] denied counsel the opportunity to decide which strategy to follow." 
The record, however, reflects that appellant made a written request for the Article 37.071, § 2(e)(2)(B),
parole charge. Appellant also did not object to submitting this parole charge to the jury during the charge
conference at the punishment phase. Points of error seven and eight are overruled.

 In point of error nine, appellant claims that the trial court erred when it denied appellant's request
to impeach Liza with evidence that she had provided deceptive answers during a polygraph examination
shortly after the murders. The polygrapher's report indicated a 97% probability of deception when Liza
stated that appellant told Viola over the phone, "Bitch come over here and I will shoot you." Liza did not
testify to this statement at trial. We understand appellant's argument to be that he should have been
allowed to impeach Liza's trial testimony with evidence that she had provided deceptive answers during
the polygraph examination without getting into the specifics of these answers. He further argues:

 [Liza] is the only witness whose testimony gave the State any evidence of a means or a
motive for Appellant to kill [the victims]. It is her testimony directly and through hearsay
which she was allowed to propound, purportedly from her deceased sister, that comprises
the only evidence that Appellant ever possessed a handgun. Specifically, [Liza] testified
that [Viola] saw a gun in Appellant's hand once about one month before January 30,
2001. She also testified that once, while moving some of Appellant's clothing, she felt
something heavy and asked Appellant if he had a gun. [Liza] said that Appellant told her
that he did have a gun. It is also only her testimony that tends to prove that Appellant had
an argument with [Viola] on January 30, 2001.[ (6)]


 Though this Court has held that polygraph evidence is inadmissible for all purposes, (7) appellant
claims that this Court should revisit the admissibility of this evidence under the later adopted scientific
evidence test set out in Daubert/Kelly. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 113 S.Ct.
2786 (1993); Kelly v. State, 824 S.W.2d 568 (Tex.Cr.App. 1992). The record, however, reflects that
appellant presented to the trial court only a memorandum of law containing various federal court decisions
that have upheld the admissibility of polygraph evidence. This, without more scientific proof, would be
insufficient under Daubert/Kelly to establish the reliability of the polygraph evidence in this case. See
Kelly, 824 S.W.2d at 573 (proponent of scientific evidence must show that the technique applying the
underlying scientific theory was properly applied on the occasion in question). And, since we are not
reviewing a trial court's admission of scientific evidence on a "bare trial court record concerning scientific
reliability," we may judicially notice that "there is simply no consensus that polygraph evidence is reliable." 
See United States v. Scheffer, 118 S.Ct. 1261, 1265-66 (1998); Hernandez v. State, 116 S.W.3d 26,
29, 32 (Tex.Cr.App. 2003) (appellate courts may judicially notice other courts' determinations of the
unreliability of a particular scientific methodology so long as these determinations are not the sole source
for upholding a trial court's admission of scientific evidence).

 We cannot conclude that the trial court abused its discretion to exclude the polygraph evidence. 
And, even if the trial court did abuse its discretion, the exclusion of the polygraph evidence was harmless
in light of the overwhelming evidence of appellant's guilt and the other evidence (including appellant's own
statements to the police) that corroborated the material aspects of Liza's testimony. Point of error nine is
overruled.

 In point of error ten, appellant claims that the trial court reversibly erred when it denied appellant's
motion for a psychiatric examination to determine his competency to continue to stand trial after the jury
had returned a guilty verdict and prior to the commencement of the punishment phase. (8) In support of this
motion, appellant's lawyer claimed that, after the jury's guilty verdict, appellant made statements to his
mother and to his other lawyer "which suggest some irrationality" and that appellant did not want his
lawyers to call any witnesses on his behalf at the punishment phase. (9)

 [THE COURT]: On the record, prior to bringing the jury back in, the Court has been given
a Defense Motion for Continuance No. 4, and Request for Psychiatric Examination of the
Defendant to Determine Competency to Continue to Stand trial.


 The Court will give both sides an opportunity to give argument with regard to those
matters.


 It's the understanding of the Court that [appellant] is not in - necessarily- in necessary
agreement that he is incompetent to stand trial. And, for the record, this Court has had the
opportunity for the past seven weeks to be able to look at [appellant] and observe his
ability to interact with Counsel in the picking of the jury in this cause, and for other matters,
and - I will allow you to make your argument, Counsel, but for the record, it's my opinion
that [appellant] does know what he is doing and he is competent to stand trial, based on
just my observations. And, of course, I'm not a psychologist or a psychiatrist, either one. 
But just my observations over the last seven weeks of this trial, you know, --


 [DEFENSE COUNSEL]: Your Honor, [appellant], since the return of the verdict, has
made statements to his mother and to co-counsel which suggest some irrationality, since
all of us believe that life is precious and that it's to be preserved at all cost. [Appellant]
insists that that's not a sign of irrationality, and he disagrees with our filing the motion to
have him examined, and he believes he is competent to stand trial. I have counseled him
that he should permit us to call witnesses in his defense on the issue of punishment. He
insists that we should not do that.


 And he has asked if there is any doubt in the Court's mind to let him address the Court and
show that he is competent.


 I think the Court has already expressed a view that indicates that the Court believes that
[appellant] is competent.


 [THE COURT]: Again, I - you know, if he wants to address the Court, I don't have any
problem with him addressing the Court. But if that's the purpose of addressing the Court,
I really don't -


 [DEFENSE COUNSEL]: He's not interested in addressing the Court.


 [THE PROSECUTION]: May I have just a moment, Your Honor?


 [THE COURT]: Sure.


 (Pause.)


 [THE PROSECUTION]: Your Honor, the only thing the State would add, in addition to
the things that have been said, is in agreement with the Court being in the courtroom for the
past six or seven weeks, we've observed also the interaction, don't have any idea what
he's talking to his lawyers about, but have seen the interaction on - every day, on a daily
basis, multiple times a day, his interaction with him and his lawyers. Also would say for the
record that when the Court stated that they had filed a Motion for a Psychiatric
Examination, he was shaking his head "No," as if to disagree with that. And when the
Court said in your opinion that he was competent, [appellant] shaked [sic] his head in the
affirmative, that he was agreeing with that, Judge.


 And so, that's all we would have, in addition to what the Defense said.


 [THE COURT]: For the purpose of the record, the Motion for Psychiatric Examination
and the Motion for Continuance in this cause will be denied by the Court.


 The trial court was within its discretion to decide that appellant presented no evidence that raised
a bona fide doubt regarding appellant's competency to continue to stand trial. See McDaniel v. State,
98 S.W.3d 704, 710-11 (Tex.Cr.App. 2003). The trial court did not believe that appellant was
incompetent based on its personal observations of appellant over several weeks. See McDaniel, 98
S.W.3d at 710-11 n.19 (trial court may consider a defendant's conduct or statements in court) and at 713
(trial court's first-hand factual assessment of a defendant's competency is entitled to great deference). 
Appellant's statements to his mother and to co-counsel "which suggest some irrationality" and appellant
not wanting to have witnesses called on his behalf at the punishment phase do not necessarily show
appellant's inability to rationally consult with his lawyers or to understand the proceedings against him. See
McDaniel, 98 S.W.3d at 709-10 and at 710 n. 19 (reliable evidence of incompetency could be in the form
of the defendant's attorney orally reciting "the specific problems he has had communicating with his client"). 
Point of error ten is overruled.

 In points of error fourteen through seventeen, appellant claims that the trial court's denial of three
of his motions for continuance violated various state and federal constitutional provisions. Appellant argues:

 Appellant's complaint regarding the Trial Court's overruling his motions for continuance
is that the error was cumulative. That is to say that if the relief sought by any of the motions
had been granted, Appellant might not have been denied effective assistance of counsel. 
However, since the court overruled all three motions, both the Constitution of the United
States and of Texas were violated and he was harmed substantially.


 The basis of appellant's motions for continuance was the prosecution's alleged failure to comply
with pretrial discovery orders. Appellant filed his first motion for continuance on July 22, 2002, about two
weeks before individual voir dire was scheduled to begin, and the trial court had a hearing on the motion
on the same day. The trial court proposed postponing voir dire for a couple of days until appellant could
get things "squared away with the DA's Office." Appellant responded that "that would help" and informed
the trial court that he was thinking of asking for a continuance until "sometime in the year 2003." The trial
court indicated that it would probably deny a continuance for that length of time. Appellant did not obtain
a ruling on his first motion for continuance as required by Tex.R.App.Proc. 33.1(a)(2)(A).

 [THE COURT]: And it gives us an opportunity then - you know, once we get them back
on Wednesday - and I've got your Motion for Continuance, Floyd, and we'll talk about
that, but that might give us then - if we put off actually starting our first voir dire until the
7th instead of the 5th, give you an opportunity to get whatever information you're trying to
get squared away with the DA's Office, we can kind of -


 [DEFENSE COUNSEL]: That would help, Judge.


 [THE COURT]: -get that squared away.


 [DEFENSE COUNSEL]: Of course, my Motion for Continuance, I was thinking
sometime in the year 2003.


 [THE COURT]: Probably the Court would deny a continuance for that length of time.


 [DEFENSE COUNSEL]: I understand.

 

 Appellant filed his second motion for continuance on July 29, 2002, and the trial court had a hearing
on the motion on the same day. Appellant claimed that "there's just so much that we still don't have access
to" and claimed that he needed "some additional time to obtain records and other information." The
prosecution responded that many of the assertions appellant made were "just not true." The prosecution
further responded that pursuant to an "open-file policy" it had "provided every [nonprivileged]
documentation that the State has in its possession" including witness statements that the law did not require
the prosecution to provide. The trial court denied appellant's second motion for continuance.

 [THE COURT]: With regard to the request for Motion for Continuance, the general voir
dire on this case is scheduled to begin - or, general voir dire will begin today and the
individual voir dire will not begin until August the 7th in this cause. And, traditionally, it
takes about 24 working days to select a jury. So, in the estimation of the Court, that's
over 30 days that you have to obtain the information you've requested.


 I will deny the Motion for Continuance and overruled the objections to the late filing of the
extraneous offenses and overrule the objections to the State's failure to obey the pretrial
discovery orders.


 [THE PROSECUTION]: Your Honor, just for the purposes of the record, some of the
assertions that have been in the Motion for Discovery are just absolutely not true. And
some of the assertions that were just made by [appellant's lawyer], for instance, the one
from - the man that was at the apartment saying that he doesn't want to get involved, and
things like that, well, if you don't see anything or didn't hear anything, I guess that's another
way of saying you don't want to get involved. But those assertions - and a lot of the
assertions that are made in the Motion for Discovery are just not true.


 We have provided - have an open-file policy and have provided every documentation that
the State has in its possession, other than work product, to [appellant's lawyers]. We've
provided every page of discovery that we have, including witness statements that we're not
even required by law to give until that witness was to testify. And we've given all those
informations and have that open-file policy, Judge.

 

 Appellant filed his third motion for continuance on September 12, 2002, and the trial court had a
hearing on the motion on the next day. Appellant again complained that the prosecution was not
complying with the pretrial discovery orders. The prosecution responded that appellant had everything that
the prosecution had "as far as in the way of reports or anything of that nature." The trial court denied the
motion and informed appellant that if "there is a witness that testifies that you have not - or, that they call
that you have not had an opportunity to interview, I will take that up at that particular time." Appellant
made no such claim of prejudice during trial. 

 On this record, the trial court would have been within its discretion to find that the prosecution
complied with the pretrial discovery orders. See Heiselbetz v. State, 906 S.W.2d 500, 511 (Tex.Cr.App.
1995) (granting or denying motion for continuance within trial court's sound discretion). Appellant also has
not shown any actual prejudice from the denial of his motions for continuance. See id. (defendant must
show actual prejudice from denial of motion for continuance); see also Janecka v. State, 937 S.W.2d
456, 468 (Tex.Cr.App. 1996), cert. denied, 118 S.Ct. 86 (1997) (defendant must show actual prejudice
from the denial of a motion for continuance). Points of error fourteen through seventeen are overruled.

 The judgment of the trial court is affirmed.


 Hervey, J.


Delivered: May 5, 2004

Publish 
1. The "coward" comment apparently was over some incident in which appellant threatened someone
with a gun.


 Q. [THE PROSECUTION]: Okay. And, Mr. Martin, was it your understanding that the
comment regarding "coward" was because of some incident where there had been a threat
with a gun that [appellant] had used?


 A. [RONNIE MARTIN]: Yes.
2. Emphasis in bold added.
3. Emphasis in underline added.
4. Emphasis in bold added.
5. See Luquis, 72 S.W.3d at 363 (no error under state law in giving jury a statutorily-required jury
instruction).
6. The record does not support these assertions. In his statement to the police, appellant admitted
that he and Viola had argued and that he had threatened her. In addition, another witness (Martin) testified
about an "incident where there had been a threat with a gun that [appellant] had used." See Footnote 1.
7. See Tennard v. State, 802 S.W.2d 678, 683 (Tex.Cr.App. 1990), cert. denied, 111 S.Ct. 2914
(1991).
8. The applicable law is set out in Former Article 46.02 of the Texas Code of Criminal Procedure
which was repealed by Acts 2003, 78th Leg., ch. 35, § 15 (effective January 1, 2004). Current law is
codified in Article 46B of the Texas Code of Criminal Procedure.
9. The record reflects that appellant subsequently called witnesses on his behalf at the punishment
phase.