NO. 07-06-0386-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

MARCH 26, 2008
_____

SHARON BOULWARE, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE
_____

FROM THE 217TH DISTRICT COURT OF ANGELINA COUNTY;

NO. CR-22215; HONORABLE DAVID V. WILSON, JUDGE
_____

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

**MEMORANDUM OPINION**

Appellant, Sharon Boulware, was convicted of two counts of intentionally and knowingly causing serious bodily injury to an elderly individual. A jury assessed punishment at confinement in the Institutional Division of the Texas Department of Criminal Justice for a period of ten years for Count I and eight years for Count II. Appellant, through two issues, contends the trial court committed reversible error by denying two challenges for cause during voir dire and that the evidence is factually and legally insufficient. We affirm.

Factual And Procedural Background

Appellant owned and operated a home for elderly persons in Angelina County, Texas. The facility was not licensed by the State. In 1999, two of the residents of appellant's facility were moved under circumstances that raised concerns of insufficient medical attention and lack of proper care and nutrition. Ultimately, appellant was indicted in a two count indictment for injury to an elderly individual.

In Count I of the indictment, the State was required to prove that appellant intentionally or knowingly, by omission, caused serious bodily injury to Raymond Davis, an elderly person, by failing to provide adequate nutrition and by failing to provide medical attention. In Count II, the allegations were the same, except that the victim was Jewell Russell and the act was in failing to provide adequate medical attention.

During the trial, the State produced evidence that Raymond Davis, the elderly person named in Count I of the indictment, began living in the Boulware home in September 1999. At the time Mr. Davis entered the Boulware home, he was suffering from dementia and had possibly suffered a mini-stroke. Davis' son, Gaylon, testified that his father was eating well when he entered the home and that he was on a couple of medications. When Gaylon first met appellant, there was no mention that appellant's home was simply a "boarding house." Gaylon further testified that, in October of 1999, he took his father to see Dr. Krohn. At the time of this visit, Mr. Davis had lost ten pounds. On November 29, 1999, Gaylon received a phone call from appellant stating that an ambulance was picking his father up and that Mr. Davis was probably not going to live.

2

Upon arriving at the hospital, Gaylon observed that his father was incoherent and non-responsive. Mr. Davis died shortly after getting to the hospital. Gaylon further stated that during the three months his father lived at the Boulware house, appellant never voiced any concern over being able to provide Mr. Davis proper care.

Dr. Krohn testified that he had been Mr. Davis's physician for a little over a year. Dr. Krohn testified that, when he observed Mr. Davis at the emergency room, he found Mr. Davis to be totally unresponsive and breathing very rapidly. Dr. Krohn also testified that, upon arrival at the hospital, Mr. Davis weighed 97.9 pounds and that this amounted to a 23 pound weight loss over a 30 day period. Tests run on Mr. Davis while in the emergency room showed him to be suffering from acidosis, an empty bladder, and non-functioning kidneys. The doctor further testified that Mr. Davis's skin was "tenting" which was a sign of dehydration. Further, at the time of admission to the emergency room, Mr. Davis was suffering from septic shock, meaning he had an ongoing infection within his body. All of the test results and observations led the doctor to believe that Mr. Davis's acute medical conditions had been present for several days. The record reveals that the doctor, at the request of the family, did not attempt any "heroic" measures to prolong Mr. Davis's life. However, the doctor did state that he was not sure if they could have saved Mr. Davis's life even had they attempted heroic measures.

In Count II of the indictment, the evidence showed that the elderly victim, Jewell Russell, entered the Boulware facility in May of 1999. At the time Mrs. Russell came to the facility, she was not ambulatory and required feeding by a third person. Mrs. Russell was required to take three prescriptions a day and was suffering dementia. Hayden Russell,

her son, testified that at the time his mother was placed at the Boulware facility, it was his understanding that appellant would provide lodging, food, and oversight of Mrs. Russell's medical condition, specifically including administering of her medications.

In December 1999, Hayden testified, he observed his mother's condition to have worsened significantly. As a result of his concern, Hayden and his father agreed to transfer his mother to a nursing home in San Augustine. Mrs. Russell was taken to the nursing home in San Augustine; however, upon arrival, nurses examined Mrs. Russell and, as a result of the nurses' observations, she was immediately transferred to the hospital in San Augustine. Mrs. Russell was subsequently sent to the hospital in Lufkin.

Mrs. Russell's treating physician in Lufkin, Dr. Russell, testified as to her condition upon arrival at the emergency room in Lufkin, including skin ulcers that required surgical intervention.[1] The doctor further testified that, although the skin ulcers themselves would not cause a significant risk of death, left untreated there was a significant chance of infection that could result in death.

Also testifying about Mrs. Russell's condition on the day she left the Boulware facility was Angie McGowan. McGowan is a registered nurse who was working at the Colonial Pines Health Care, the nursing home to which Mrs. Russell was originally transferred. McGowan had an opportunity to observe Mrs. Russell the day she was brought to the nursing home and discovered a skin ulcer the size of McGowan's fist over

---

[1] Although Dr. Russell shares the same last name as Mrs. Jewell Russell, there is nothing in the record to indicate that they are related.

Mrs. Russell's sacrum that went to the bone. At the time the ulcer was discovered, there was no bandaging covering the area. Mrs. Russell also had several other skin ulcers, one of which also went all the way to the bone. None of these ulcers were covered with bandages. Additionally, McGowan testified that Mrs. Russell appeared to be malnourished. McGowan further stated that, as a result of Mrs. Russell's condition, she could not be admitted to the nursing home but had to be sent to the hospital in San Augustine. McGowan further testified that she reported Mrs. Russell's condition to the Texas Department of Health. After McGowan had occasion to report the incident to the State, appellant called to the nursing home very upset that the matter had been reported to the State. According to McGowan, appellant threatened her during the conversation.

Also testifying for the State was Becky Adams who was, at the time Mrs. Russell was admitted to the hospital in Lufkin, a social worker at Lufkin Memorial Hospital. She testified as to her training and experience in detecting signs of abuse. Following the testimony concerning her training, Adams stated that, on the day of Mrs. Russell's admission to the hospital in Lufkin, she noticed a foul odor which Adams attributed to a lack of personal cleanliness. Adams also testified that Mrs. Russell had bed sores and a dirty catheter. Adams opined that the general state of cleanliness, both as to Mrs. Russell personally and her catheter, are red flags for an abusive situation. The day following Mrs. Russell's admission to the Lufkin hospital, Adams had the opportunity to visit with appellant about Mrs. Russell's care. According to Adams, appellant became very upset and appeared to be upset that Adams was questioning her care of Mrs. Russell. This, based upon her experience as a social worker in the health care area, was very unusual.

5

Pat Beaugh, a retired Texas Department Human Services employee, testified about her role as a "surveyor" of nursing homes, both licensed and unlicensed. Beaugh pointed out that she only went to unlicensed homes on the basis of complaints and that all visits were unannounced. Beaugh stated that she conducted a visit of appellant's facility in December 1999. The complaints were of abuse from neglect and about food fed to the residents. During the visit, Beaugh noticed that some of the residents required medical attention that they had not apparently been receiving. Beaugh testified that she observed one resident with a feeding tube that was unsanitary and appeared to be crusted over. She also observed another patient with a catheter that appeared to be crusted over. Beaugh's observations prompted a second visit. When asked whether or not any of the conditions she observed at the December visit could, in her opinion, have been caused by a failure to provide medical attention, Beaugh answered affirmatively. Beaugh also testified that some the conditions she observed in the residents were caused by a failure to provide proper nutrition. When Beaugh went back for a third visit, all of the residents of appellant's facility had been moved. As to Mrs. Russell, Beaugh had the opportunity to review her medical records at both the San Augustine nursing home and the hospital in Lufkin, which revealed injuries and conditions that, in Beaugh's opinion, created a substantial risk of death for Mrs. Russell. Further, Beaugh stated that these conditions were as a result of failure to provide medical attention to Mrs. Russell.

Appellant presented evidence that there were home health providers that visited her facility and provided care to residents. However, Patricia Jones, the director of a community based care program, could not testify with any certainty that her agency

6

provided services for either of the two elderly residents listed on the indictment. Another witness for appellant, Glenda Havard, testified that in 1999 she was involved in home health care and had been to appellant's facility. At the time Havard was present, the facility appeared clean. However, the resident that received treatment from Havard was not one of the residents listed on either count of the indictment. Appellant testified that she did not intend, nor promise to give, medical attention to her residents. Appellant's position throughout the trial was that she ran a boarding house only. Appellant was convicted of both counts and sentenced by the jury. Appellant now challenges her conviction on two grounds.

## Voir Dire Challenges

First, appellant contends that the trial court erred in denying challenges for cause as to two prospective jurors. During the voir dire process, appellant became concerned that two of the prospective jurors could not be fair. Prospective juror Lampkin voiced some concern about being able to be fair in a case involving an elderly victim. Prospective juror Brown indicated that one of the treating physicians, who was scheduled to testify, was his family doctor and that the prospective juror would believe the doctor. At the close of general voir dire, appellant challenged each of the above mentioned prospective jurors for cause. The trial court denied the challenges.

Appellant contends that the trial court committed reversible error when the court overruled appellant's challenges for cause as to prospective jurors Brown and Lampkin. In order to preserve a challenge for cause, the appellant must demonstrate that there was

a clear and specific challenge made known to the trial court. Feldman v. State, 71 S.W.3d 738, 744 (Tex.Crim.App. 2002). In the case at bar, appellant simply stated, after voir dire had been completed, that he challenged jurors number 26 and 32. He then stated their names. At no time during this colloquy did appellant state the reason that the prospective jurors were challengeable. During appellant's voir dire, each of those jurors were questioned about issues connected with the case and, in each case, the prospective juror either requested the court to be excused as a juror in this matter or made a statement that they personally did not feel they were an appropriate juror for this case. Neither of these statements are a challenge for cause nor do they inform the court the basis for appellant's challenge. Id. As such, nothing is preserved for appeal. Appellant's first issue is overruled.

Sufficiency of the Evidence

Appellant next contends that the evidence was not legally nor factually sufficient to sustain the conviction. When both legal and factual sufficiency are attacked, we must first address the issue of legal sufficiency. See Clewis v. State, 922 S.W.2d 126, 133 (Tex.Crim.App. 1996). If the evidence is legally sufficient, we then review the factual sufficiency challenge. See id. In assessing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Ross v. State, 133 S.W.3d 618, 620 (Tex.Crim.App. 2004). In conducting a legal sufficiency review, an appellate court may not sit as a thirteenth juror, but rather must uphold the jury's

8

verdict unless it is irrational or unsupported by more than a mere modicum of evidence. Moreno v. State, 755 S.W.2d 866, 867 (Tex.Crim.App. 1988).

When an appellant challenges the factual sufficiency of the evidence supporting his conviction, the reviewing court must determine whether, considering all the evidence in a neutral light, the jury was rationally justified in finding the appellant guilty beyond a reasonable doubt. See Watson v. State, 204 S.W.3d 404, 415 (Tex.Crim.App. 2006). In performing a factual sufficiency review, we must give deference to the fact finder's determinations if supported by evidence and may not order a new trial simply because we may disagree with the verdict. See id. at 417. As an appellate court, we are not justified in ordering a new trial unless there is some objective basis in the record demonstrating that the great weight and preponderance of the evidence contradicts the jury's verdict. See id. Additionally, an appellate opinion addressing factual sufficiency must include a discussion of the most important evidence that appellant claims undermines the jury's verdict. Sims v. State, 99 S.W.3d 600, 603 (Tex.Crim.App. 2003).

The indictment alleges, in two counts, that appellant intentionally or knowingly by omission caused serious bodily injury to an individual 65 years of age or older by the failure to perform certain acts specified in each count.[2] See TEX. PENAL CODE ANN. § 22.04(a) (Vernon Supp. 2007). Injury to an elderly person is a result oriented offense. See Johnston v. State, 150 S.W.3d 630, 634 (Tex.App.–Austin 2004, no pet.)(citing Alvarado v. State, 704 S.W.2d 36, 39 (Tex.Crim.App. 1985)). Thus, the State had to prove both that

---

[2] References to the Texas Penal Code Annotated will hereafter be by § ___.

9

appellant intentionally or knowingly failed to provide medical care or nutrition, and that she intentionally or knowingly caused the injury. Id. A person acts intentionally when "it is his conscious desire to engage in the conduct or cause the result." § 6.03(a). A person acts knowingly with respect to a result of his conduct when "he is aware that his conduct is reasonably certain to cause a result." § 6.03(b). In a sufficiency review, the jury's inference of intent is afforded more deference than the evidence supporting proof of conduct. Connell v. State, 233 S.W.3d 460, 466 (Tex.App.–Fort Worth 2007, no pet.) (citing Margraves v. State, 34 S.W.3d 912, 919 (Tex.Crim.App. 2000)). Stated differently, if the record supports conflicting inferences regarding appellant's intent or knowledge, we must presume that the trier of fact resolved any such conflict in favor of the prosecution, and we must defer to that resolution. Couchman v. State, 3 S.W.3d 155, 163 (Tex.App.–Fort Worth 1999, pet. ref'd) Additionally, it is not necessary that each fact point directly and independently to the guilt as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction. Hooper v. State, 214 S.W.3d 9, 13 (Tex.Crim.App. 2007). Circumstantial evidence is as probative as direct evidence in establishing the guilt of a person, and circumstantial evidence alone is sufficient to establish guilt. Id.

Appellant has not directly challenged the implied jury finding that she assumed care, custody, or control of the elderly residents of her facility. Rather, she has indirectly challenged this issue by contending that she was just running a boarding house. Assuming, for purpose of this appeal, that claiming to only run a boarding house does in fact challenge the sufficiency of the evidence, both legally and factually, as to the issue of

10

care, custody, or control, we turn to § 22.04(d) for the definition of care, custody and control. See Hicks v. State, 241 S.W.3d 543, 546 (Tex.Crim.App. 2007). § 22.04(d) provides, in relevant part:

> "For purposes of an omission that causes a condition described by Subsection (a)(1), (2), or (3), the actor has assumed care, custody, or control if he has by act, words, or course of conduct acted so as to cause a reasonable person to conclude that he accepted responsibility for protection, food, shelter, and medical care for a child, elderly individual, or disabled individual. . . . "

TEX. PENAL CODE ANN. § 22.04(d) (Vernon 2001).

The jury, by its verdict, has impliedly found this issue adversely to appellant. The evidence, in the form of the testimony from the family of the residents, supports this finding by the jury. Jackson, 443 U.S. at 319; Ross, 133 S.W.3d at 620. Furthermore, the evidence supports the factual sufficiency, because the jury rejected the alternative theory of running a boarding house by its verdict. We cannot say that the jury's decision was in any form an irrational one. Watson, 204 S.W.3d at 415.

In Count I of the indictment referencing Mr. Davis as the elderly victim, the culpable conduct was failing to provide nutrition and failing to provide medical attention. Appellant's contention regarding the sufficiency of the evidence is centered on the issue of intent. Specifically, appellant urges that the evidence is both legally and factually insufficient to show that appellant intended the result, serious bodily injury, or that her omission was reasonably certain to cause the injuries sustained.

11

Once having assumed the care, custody, or control of the individuals, appellant's actions must be then measured accordingly. The evidence showed that Mr. Davis entered the facility ambulatory with dementia in September 1999. By October 1999, when he went to the doctor, he had lost 10 pounds. On the day the ambulance took him to the hospital, Mr. Davis was down to 97 pounds. Appellant admitted that Mr. Davis seemed on occasion not to eat. The doctor noted that when Mr. Davis was seen in the emergency room he was non-ambulatory and incoherent. Mr. Davis was suffering from a number of serious medical problems including septic shock, acidosis, renal failure and dehydration. As to the dehydration, the doctor explained that Mr. Davis's skin was tenting, meaning that if you pulled it up it did not have enough elasticity to even go back down. The doctor further opined that these problems had been ongoing for several days.

Appellant's position seemed to be that she did not purport to provide medical care and that she only ran a boarding house. However, appellant did accept Mr. Davis into the facility and thereby assumed some responsibility. When we apply the standards of review for legal sufficiency, keeping in mind that we must view the evidence in the light most favorable to the verdict, we cannot say that the jury acted irrationally in finding that appellant failed to provide nutrition or medical attention after assuming care of Mr. Davis. Jackson, 443 U.S. at 319; Ross, 133 S.W.3d at 620.

Having determined that the evidence was legally sufficient, we must now review the factual sufficiency. The evidence reveals that appellant had daily contact with Mr. Davis. The record further reflects that Mr. Davis had lost over 30 pounds while living in appellant's facility and had gone from an ambulatory patient to a bedridden patient. The doctor's

12

testimony reveals that the process that resulted in the death of Mr. Davis did not occur suddenly, but rather was ongoing for several days. To all of this appellant simply states that she did not accept Mr. Davis into the facility to provide medical care; however, she did accept him into the facility and thereby the duty of care, custody or control of Mr. Davis. The jury could infer from this record that appellant failed by omission to seek medical assistance for Mr. Davis even though it was apparent he was in severe medical distress. Couchman, 3 S.W.3d at 163. Thus, there is factually sufficient evidence to support the verdict of the jury and, viewing the evidence in a neutral light, we cannot say that the jury acted irrationally in finding appellant guilty beyond a reasonable doubt. Watson, 204 S.W.3d at 415.

In Count II of the indictment referencing Mrs. Russell as the victim, the culpable conduct was failing to provide adequate medical attention to her. Appellant's contention regarding the evidence is the same as in Count I, that the evidence was not sufficient on the intent element. Again, appellant has not challenged the fact that by accepting Mrs. Russell into her facility she has care, custody and control over her.

The evidence at trial showed that Mrs. Russell entered the facility in May 1999, non-ambulatory, requiring assistance in feeding and taking several medications each day. The testimony further revealed that the family of Mrs. Russell believed that appellant was providing room, board, and would oversee her medical conditions, including administering of her medication. During most of Mrs. Russell's stay at the facility, her husband, Dale Russell was present daily and assisted in feeding her. Mrs. Russell's son, Hayden, testified that by December 1999 his mother's condition had become worse and he

convinced his father to transfer her to a nursing home in San Augustine. Upon arrival at the nursing home, Mrs. Russell was evaluated by the nursing staff. The nurse who did the evaluation testified that, upon examining Mrs. Russell, she observed a Stage IV bedsore on Russell's back above the sacrum. This sore was about the size of the nurse's fist and went to the bone. There were additional sores. None of which were bandaged at the time Mrs. Russell arrived at the nursing home. The nurse further stated that Mrs. Russell appeared to be dirty and malnourished when she arrived at the nursing home. As a result of this finding, Mrs. Russell was transferred to the San Augustine hospital and from there to the Lufkin Memorial Hospital.

Upon arrival at the hospital in Lufkin, Mrs. Russell was treated by Dr. Jeffery Russell. The doctor opined that the bedsore could not by themselves cause death; however, if they had been left untreated there was a significant possibility of infection that could cause death. When first arriving at Lufkin Memorial Hospital, Mrs. Russell was also observed by Becky Adams. Adams, the social worker at Lufkin Memorial Hospital, testified that Mrs. Russell's bedsores emitted a foul odor, that her catheter was dirty and that Mrs. Russell personally appeared dirty. Adams testified that, based upon her training, the bedsores, dirty catheter, and lack of personal cleanliness were all red flags for an abuse by neglect situation. Pat Beaugh, a retired Texas Department of Human Services employee, testified about visits she made to appellant's facility in December 1999 and January 2000 and that the ultimate outcome of her visits was a decision to move all of the remaining residents out of the facility.

Appellant presented the same evidence that she had never held herself out to provide medical care. In addition, relatives of other patients who had filed no complaints testified about their observations of the facility and the manner in which it was run.

When all of this evidence is viewed in the light most favorable to the verdict, as we must in a legal sufficiency review, we cannot say the jury was acting irrational when it found the evidence sufficient to convict beyond a reasonable doubt. Jackson, 443 U.S. at 319; Ross, 133 S.W.3d at 620.

Turning to the issue of factual sufficiency, even when reviewing the evidence in a neutral light, the jury was rationally justified in finding appellant guilty beyond a reasonable doubt. Watson, 204 S.W.3d at 415. Mrs. Russell's bedsores went to the bone and emitted a foul odor. Her catheter was dirty and Mrs. Russell herself lacked personal cleanliness, even though appellant assumed care of Mrs. Russell. Appellant relies upon the fact that she never held herself out as anything but a boarding house and that Mr. Russell was present nearly every day. These assertions, even if true, do her no good for she had accepted the resident into her facility. The jury was rationally justified in believing the testimony that all these conditions were red flags for abuse by neglect. Additionally, the jury was rationally justified in believing that, even viewing the evidence in a neutral light, that the severity of Mrs. Russell's condition indicated a lack of medical attention from appellant who had assumed the duty of care.

15

Having found that the evidence was legally and factually sufficient as to the allegations contained in both Count I and Count II of the indictment, we overrule appellant's second issue.

Conclusion

Inasmuch as we have overruled both of appellant's issues, the judgment of the trial court is affirmed.

Mackey K. Hancock<br>Justice

Do not publish.