NO. 07-09-00223-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

JULY 13, 2010

ANTONIO G. OLIVAREZ, APPELLANT

v.

THE STATE OF TEXAS, APPELLEE

FROM THE 364TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2007-416,403; HONORABLE BRADLEY S. UNDERWOOD, JUDGE

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

**MEMORANDUM OPINION**

Appellant, Antonio G. Olivarez, was convicted of assault on a public servant[1] and of taking a police officer's weapon,[2] both third-degree felonies. The jury assessed an enhanced punishment of twenty years imprisonment for each offense. We affirm.

---

[1] TEX. PENAL CODE ANN. § 22.01(a)(1), (b)(1) (Vernon Supp. 2009).

[2] TEX. PENAL CODE ANN. § 38.14(b) (Vernon Supp. 2009).

Factual and Procedural History

Just after midnight on May 7, 2007, Lubbock Police Officer Travis Bratton was on patrol, driving south on Avenue Q. After meeting a vehicle traveling north on Avenue Q, Bratton noticed, in his rear view mirror, that the vehicle's rear license plate did not appear to be properly illuminated. Bratton made a U-turn to follow the vehicle and extinguished his headlights for a moment to confirm his initial observation. After confirming that the license plate was not properly illuminated, Bratton initiated a traffic stop. The driver of the vehicle, identified as appellant, pulled into a parking lot, and Bratton pulled in behind him. Rather than remaining stopped, however, appellant jumped a curb and drove off in an easterly direction on 24th Street.

Bratton followed the vehicle, found it crashed into a fence, and observed appellant exit the vehicle and begin running. Bratton pursued appellant into a residential backyard. As appellant attempted to climb over a fence, Bratton caught up to him, pulled him down from the fence, and attempted to bring him to the ground. When appellant resisted and returned to his fence-scaling efforts, Bratton attempted to use a taser on appellant. Bratton missed making a connection between the taser's leads and appellant's body but approached and used the taser on him as a stun gun (without the leads connected to appellant). Appellant came down off the fence.

Bratton and appellant fell to the ground and struggled. Somehow, Bratton testified, appellant was able to dispossess Bratton of the taser and use it on him. After sustaining shocks from the taser to his neck, shoulder, side, and, perhaps, chest,

2

Bratton forced appellant to relinquish control of the taser and chased after appellant who had resumed his flight.

Bratton again caught up to appellant, and the two struggled over possession of the taser. During the struggle, appellant managed to use the taser against Bratton a second time and regain control of the taser. He then began running toward the fence again. Bratton pulled out his firearm and directed appellant to drop the taser or else run the risk of being shot.

Bratton heard sirens approaching and began to yell so that fellow officers could locate him in the backyard. As appellant made one last effort to scale the fence, Bratton explained to him that, if appellant continued to possess the taser, Bratton would shoot him. There appeared to be a stand-off. Bratton alerted the approaching officers that appellant had the taser. A fellow officer directed Bratton to shoot appellant. Having heard that directive, appellant tossed the taser. About that time, Bratton's fellow officers came into the backyard and took appellant into custody.

Appellant was taken to the hospital where he admitted to an officer that he used the taser on Bratton and expressed to other officers his desire to apologize to Bratton. He apologized to Bratton personally on the second morning of trial and expressed his gratitude that Bratton did not shoot him when the other officer suggested he do so.

Appellant was convicted of assault on a public servant and of taking a weapon from a police officer. Appellant timely appealed and, by two issues, asks this Court to determine whether legally and factually sufficient evidence supports those convictions.

3

## Standards of Review

In assessing the legal sufficiency of the evidence, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Ross v. State, 133 S.W.3d 618, 620 (Tex.Crim.App. 2004). In conducting a legal sufficiency review, an appellate court may not sit as a thirteenth juror, but rather must uphold the jury's verdict unless it is irrational or unsupported by more than a mere modicum of evidence. Moreno v. State, 755 S.W.2d 866, 867 (Tex.Crim.App. 1988).

In assessing the factual sufficiency of the evidence, we must determine whether, considering all the evidence in a neutral light, the jury was rationally justified in finding the appellant guilty beyond a reasonable doubt. See Watson v. State, 204 S.W.3d 404, 415 (Tex.Crim.App. 2006). In performing a factual sufficiency review, we must give deference to the trier of fact's determinations if supported by evidence and may not order a new trial simply because we may disagree with the verdict. See id. at 417. As an appellate court, we are not justified in ordering a new trial unless there is some objective basis in the record demonstrating that the great weight and preponderance of the evidence contradicts the jury's verdict. See id. Additionally, an appellate opinion addressing factual sufficiency must include a discussion of the most important evidence that appellant claims undermines the jury's verdict. Sims v. State, 99 S.W.3d 600, 603 (Tex.Crim.App. 2003). However, when a defendant's version of the facts conflicts with other evidence, we must recognize that it is the jury's prerogative to judge the credibility

4

of the evidence and to ascribe the weight to be given to the evidence.  See Jones v. State, 944 S.W.2d 642, 647–48 (Tex.Crim.App. 1996).

Analysis

The record shows that appellant possessed the taser on two separate occasions, each being relevant to one of the two offenses for which appellant was convicted.

Assault on a Public Servant

A person commits assault if he or she "intentionally, knowingly, or recklessly causes bodily injury to another."  TEX. PENAL CODE ANN. § 22.01(a)(1).  Assault is a Class A misdemeanor but is elevated to a third-degree felony if "committed against . . . a person the actor knows is a public servant while the public servant is lawfully discharging an official duty, or in retaliation or on account of an exercise of official power or performance of an official duty as a public servant."  Id. § 22.01(b)(1).

Mental State

A person acts intentionally "when it is his conscious objective or desire to engage in the conduct or cause the result."  Id. § 6.03(a) (Vernon 2003).  A person acts knowingly "when he is aware of the nature of his conduct or that the circumstances exist" or "when he is aware that his conduct is reasonably certain to cause the result." Id. § 6.03(b).  A person acts recklessly "when he is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." Id. § 6.03(c).  The trier of fact may infer intent from direct evidence and from

circumstances surrounding the act.  See Guevara v. State, 152 S.W.3d 45, 50 (Tex.Crim.App. 2004); Brown v. State, 122 S.W.3d 794, 800 (Tex.Crim.App. 2003).

Appellant challenges the sufficiency of the evidence to show that he acted with the requisite intent when he used the taser against Bratton.  We revisit and elaborate on the details of the first occasion on which appellant gained control of the taser.

Following a brief pursuit, Bratton found appellant in a backyard trying to scale a wooden fence and go into the alley.  Bratton pulled him down off the fence and directed him to get on the ground.  Bratton testified that appellant just stood there and looked at him for a moment.  Bratton then tried to force appellant to the ground.  A struggle between the two men ensued in which appellant swung a fist at Bratton but apparently missed.

Bratton drew his taser and ordered appellant to get to the ground.  Faced with appellant's continued defiance, Bratton fired his taser but missed making a connection with the leads.  As appellant tried to scale the fence, Bratton used the taser on him in what Bratton explained is the taser's "drive stun" function.  Bratton explained that a drive stun delivers less voltage because the taser's leads are not connected to the person but remains powerful at any rate.  In order to effectively drive stun a person, Bratton testified, the shooter must maintain direct contact between the taser and the person.

Appellant came off the fence at that point, and a brief struggle ensued in which both men went to the ground.  Bratton was on top of appellant and directed him to roll over so that he could be placed under arrest.  Appellant continued to struggle and responded in a "distressed" and "upset" manner that he was not going or could not go to

jail. At this point, Bratton had decided to use the taser again on the still-defiant appellant but discovered that appellant had the taser. Then, appellant began drive stunning Bratton. Bratton testified that he could not recall how appellant obtained possession of the taser.

Bratton testified that appellant used the taser on him on several places on his body. He also explained that, to operate the taser, one must turn a switch to activate it and then pull the trigger, meaning it was likely that the switch remained on from Bratton's earlier use so that appellant would only need to pull the trigger to employ the taser. Bratton described the pain level associated with getting drive stunned as a nine or ten on a scale of one to ten. He testified that he yelled out in pain and specifically recalled getting drive stunned in the neck, explaining that "it hurt pretty bad."

After appellant used the taser on Bratton, Bratton was able to pin down appellant's arm and avoid being stunned further. Bratton struck appellant in the face with his fist two or three times, and appellant dropped the taser. As Bratton reached over to get it, appellant pushed the officer off of him and returned to the fence.

The record shows that appellant, reluctant to go to jail and trying to flee Bratton, held the taser in his hand and used it to stun the officer on the neck, shoulder, and side as the two men struggled on the ground. Bratton experienced significant pain from the taser, and appellant continued his efforts to flee. From the evidence, a rational jury could conclude that appellant intentionally used the taser against Bratton. Legally sufficient evidence supports the conviction for assault on a public servant.

7

To support his factual sufficiency contention as to the assault conviction, appellant emphasizes Bratton's testimony regarding the operation of the taser. He testified that unless a person turns the taser off, it will keep discharging for five seconds after a person pulls the trigger. He also admitted that, if a taser is discharging while located between two people, both people may experience effects of the taser. Appellant seems to suggest that the shock Bratton experienced resulted from contact with appellant as Bratton used the taser or that involuntary muscle contractions resulting from being drive stunned could have caused appellant to employ the taser during the struggle. However, Bratton saw the taser in appellant's left hand and testified that appellant made contact between the taser and Bratton's body more than once and in a number of locations. This evidence would suggest, contrary to appellant's assertions, that appellant's actions in discharging the taser on Bratton were intentional. Appellant's sole possession of the taser and the number and variety of places on which appellant used the taser on Bratton suggest that appellant's movements were products of his own volition rather than repeated accidental or involuntary responses. Further, the jury heard evidence that appellant expressed his desire to not go to jail from which it could have inferred that appellant intentionally employed the taser against Bratton to avoid being arrested. Viewing the evidence, including that evidence to which appellant points as undermining the verdict, in a neutral light, we conclude that the evidence supporting the conviction is factually sufficient. We overrule appellant's first point of error.

We note that Bratton specifically testified that he is uncertain how appellant first got the taser as the two were struggling on the ground. For this reason, the evidence concerning the first occasion on which appellant gained control of the taser may not

8

satisfy the elements of taking or attempting to take a weapon from an officer. We need not fully address that issue, however, because the details of the second occasion on which appellant gained possession of the taser *do* satisfy those elements.

Taking a Weapon from a Police Officer

The Texas Penal Code provides as follows:

> A person commits an offense if the person intentionally or knowingly and with force takes or attempts to take from a peace officer, employee or official of a correctional facility, parole officer, or community supervision and corrections department officer the officer's, employee's, or official's firearm, nightstick, stun gun, or personal protection chemical dispensing device with the intention of harming the officer, employee, or official or a third person.

TEX. PENAL CODE ANN. § 38.14(b). A "stun gun" is "a device designed to propel darts or other projectiles attached to wires that, on contact, will deliver an electrical pulse capable of incapacitating a person." Id. at § 38.14(a)(2). The actor is presumed to have known that the peace officer was, in fact, a peace officer if "the officer . . . was wearing a distinctive uniform or badge indicating his employment" or if the officer identified himself as a peace officer. Id. § 38.14(c). Again, the State was required to show that appellant acted intentionally, that it was "his conscious objective or desire to engage in the conduct or cause the result." Id. § 6.03(a)

Appellant challenges the evidence of intent and force. Keeping in mind that the trier of fact may infer intent from direct evidence and from circumstances surrounding the act, we examine the details surrounding the second time appellant gained possession of the taser. See Guevara, 152 S.W.3d at 50. We look for evidence of how appellant gained control of the taser and with what mental state he did so.

9

We rejoin the night's events as appellant got up and ran toward the fence again after having struggled with Bratton and having used the taser on him. Bratton had regained control of the taser, caught up to appellant, and prepared to drive stun him. Appellant turned around, used both hands to grab the officer's wrist and hand, and redirected the taser toward Bratton's forearm. Bratton was unable to deactivate the taser because of the positions of his hands, the taser, and appellant's grip. Bratton was again drive stunned by the taser, this time in the arm, causing him to drop the taser. Both men tried to get the taser but appellant got it first. After appellant retrieved the taser, he again started running toward the fence. At this point, Bratton drew his firearm.

He directed appellant to drop the taser on the ground or "there was a good possibility that he was going to get shot." Appellant taunted Bratton, encouraging him to go ahead and shoot. Bratton heard fellow officers approaching the area. He radioed to them and also yelled so that fellow officers could locate the two men. He then heard several of his fellow officers running toward the scene. Upon hearing the same thing, appellant made one last attempt to get over the fence. Bratton alerted the responding officers to the fact that appellant had his taser. The corporal then directed Bratton to shoot, at which point appellant threw down the taser.

The State had to prove that appellant intentionally or knowingly took or attempted to take the taser from Bratton. We initially note that appellant had earlier expressed his displeasure at the prospect of going to jail. We also know that appellant had previously used the taser against the officer, at least suggesting that he intended to do so again to further his efforts to avoid arrest. Also relevant to appellant's intent are his repeated

10

attempts to get away and his continued physical struggles with Bratton. The jury could infer from appellant's swift retrieval of the taser, after his grip and redirection of the taser forced Bratton to drop it, that it was appellant's conscious objective to regain control of the taser. The record also shows that appellant maintained control of the taser despite Bratton's directions to put it down. He kept the taser until another officer directed Bratton to shoot appellant. The record does not reveal, and appellant does not point to, evidence that would show appellant grabbed Bratton's hand and the taser, redirected the taser to drive stun Bratton, and then retrieved and maintained the taser accidentally or in any state of mind other than intentionally or knowingly.

As to the element of force, Bratton testified that he was going to use the taser against appellant again when appellant used both hands to redirect the taser at Bratton and drive stun him again by making contact between the taser and Bratton's forearm. Bratton testified that, due to the placement of appellant's grip on the taser, Bratton was unable to prevent the taser from striking him in the arm. Appellant's maneuver and the attendant shock forced Bratton to release the taser, at which point appellant quickly seized it. The record, then, shows that by turning the taser against Bratton, and maintaining his grip on the taser as it shocked Bratton, appellant used force in taking or attempting to take Bratton's taser. Of course, the resulting shock is also a relevant use of force in appellant's efforts to take control of Bratton's taser. The record does not suggest any other manner by which appellant gained possession of the taser during this portion of the two men's encounter. Legally and factually sufficient evidence supports the jury's findings as to both mental state and use of force. We overrule appellant's second issue.

11

Conclusion

Contrary to assertions made in appellant's brief and notations in the judgment that suggest appellant pleaded guilty to both offenses, the reporter's record shows that appellant pleaded not guilty to both offenses. We are authorized to reform the trial court's judgment so it may speak the truth and exercise such authority here by correcting the trial court's judgment to reflect that appellant pleaded not guilty to both offenses. See French v. State, 830 S.W.2d 607, 609 (Tex.Crim.App. 1992). Having overruled appellant's two issues on appeal, we sustain the trial court's judgment as reformed. See TEX. R. APP. P. 43.2(b).


Mackey K. Hancock
Justice


Do not publish.