NO. 07-08-0337-CR

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL B

NOVEMBER 6, 2009
______________________________

ANGELA OBALLY,


 APPELLANT

V.

THE STATE OF TEXAS, APPELLEE
_________________________________

FROM THE 364TH DISTRICT COURT OF LUBBOCK COUNTY;

NO. 2006-412208; HONORABLE BRADLEY S. UNDERWOOD, JUDGE
_______________________________


Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.
MEMORANDUM OPINION
Â Â Â Â Â Â Â Â Â Â Angela Obally, appellant, was convicted of possession with intent to deliver
methamphetamine (meth) of at least 400 grams or more.


 Pursuant to appellantâs election,
the trial judge assessed punishment at confinement in the Institutional Division of the
Texas Department of Criminal Justice for 20 years. Appellant appeals via three issues. 
We affirm.
Â 
Factual and Procedural Background
Â Â Â Â Â Â Â Â Â Â In August 2004, appellant was residing at 9007 Alcove in Lubbock County. Robin
Warren began staying at appellantâs home during August 2004. According to the record,
Warren was invited to come to the home to help appellant âcookâ some meth from a
Coleman camp fuel can. The record is clear that appellant took the camp fuel into the
home. Warren testified that appellant told her that Phil, who was identified as appellantâs
dealer, gave her the fuel can. Appellant, however, testified that she found it in the road on
her way home from work. Appellant testified that she went to bed, after returning home,
and awoke to find Warren and one of two males trying to âgasâ the meth while Warrenâs
infant child was in the room. This led to a disagreement and appellant left the home. 
Warren, on the other hand, stated that the entire group was involved in the âcookingâ of the
meth but that they ran into difficulty and appellant took a portion of the liquid and left with
it. Appellant left in Warrenâs car and went to the home of Audra Bran. 
Â Â Â Â Â Â Â Â Â Â On August 13, 2004, Detective Eric Harris of the Lubbock Police Department was
attempting to find Warren regarding an outstanding felony warrant and some forgery
charges. Harris had received a tip that Warrenâs car was seen at a rural residence in
northwest Lubbock County, where Audra Bran resided. Harris proceeded to the residence
and saw Warrenâs car in the driveway. Because there appeared to be several people at
the residence, Harris called for backup and blocked the driveway with his vehicle. While
awaiting backup, Harris noticed that individuals would come out of the house and look at
him and go back into the home. Bobby Bran, the owner of the home, eventually came out
and gave Harris and the other officers, who had arrived at the scene, permission to enter. 
Once inside, Harris was not able to find Warren, however, there was a strong chemical
smell that Harris said was associated with meth âcooking.â Appellant came forward and
informed Harris that she had driven Warrenâs car to the house. Further, appellant advised
Harris that Warren was at appellantâs home on Alcove. Appellant eventually drove back
to the Alcove address with Harris.
Â Â Â Â Â Â Â Â Â Â The testimony at trial was differing about what appellant said to Harris on the drive
back to her home. Harris recounted that appellant advised him that narcotics might be
present at the house. Appellant testified that she told Harris that she had found a âmeth
labâ in the road while driving home. The record reflects that the âmeth labâ referred to by
appellant was actually the can of Coleman camp fuel. Upon arriving at appellantâs home,
appellant signed a consent to search form. Appellant hid in the car while Harris and other
officers went into the house and arrested Warren. While at the house, Harris called for
officers from the drug task force to be dispatched to the scene. Upon searching the house,
the officers found drug paraphernalia, including syringes, spoons with residue on them, and
items generally used in the production of meth. Additionally, officers found two containers
of meth inside a freezer, one in a small Mason jar and the other in a blue tupperware
pitcher. These were field tested and they tested positive for meth. Warren and another
individual, who did not testify at trial, were arrested that day. Appellant was arrested at a
later date. 
Â Â Â Â Â Â Â Â Â Â At the trial, Warren testified for the State and gave an account that identified 
appellant as the person who had the âmeth labâ and claimed that she had recruited Warren
and her male companion to come over and assist in the meth âcook.â Further, Warren
identified a letter that appellant had sent to Warren while both were in jail. The letter,
which was introduced into evidence, contained admissions by appellant that she was sorry
that she got Warren involved in the meth situation and that appellant took the blame for the
meth that was located in the house. The State also provided the testimony of Randy
Nelson, an investigator for the State, who is a handwriting expert. Nelson testified that,
based upon his examination of a handwriting exemplar provided by appellant, the letter in
question was written by appellant and did not appear to be altered. The Stateâs chemist
testified that the amount of meth found at the house was 1.17 kg and that the solution was
in a base state, meaning that the liquid had not been gassed to extract the meth into a
powder form. Further, the chemist stated that the solution contained less than 1 percent
concentration of meth. 
Â Â Â Â Â Â Â Â Â Â Appellant testified in her own behalf and claimed that the only meth in the house
was what had been made with the Coleman camp fuel, minus the half of it that she took
to Audra Branâs house. Appellant testified that Warren and the two males had gassed the
meth she left. Further, appellant stated that she had no knowledge of the meth solution
found in the freezer in a Mason jar or plastic Tupperware pitcher. Additionally, appellant
attempted to contradict the testimony of Harris by saying that she told him about finding
the Coleman fuel can on her way home from work and that Harris was the one that told her
to hide in his car when he entered the house. Finally, appellant claimed that her letter to
Warren had been altered to reflect that she was responsible for the meth in the house. 
Â Â Â Â Â Â Â Â Â Â The jury returned a verdict of guilty to the charge of possession of meth with intent
to distribute. Appellant perfected her appeal and alleges that the evidence is legally
insufficient to link her to the meth discovered at the Alcove address; there is insufficient
corroboration of the testimony of the accomplice, Warren; and the evidence is factually
insufficient to prove possession of the meth with intent to distribute. Disagreeing with
appellant, we will affirm.
Corroboration of Accomplice Testimony
Â Â Â Â Â Â Â Â Â Â We will first address appellantâs contention that the evidence was insufficient to
corroborate the testimony of Robin Warren, an accomplice as a matter of law. The record
reflects that there was no contested issue about Warrenâs status as an accomplice as a
matter of law and, in fact, the trial court so charged the jury. The standard by which we
review the corroboration of accomplice witness testimony requires that the reviewing court
eliminates all of the accomplice testimony from consideration and then examines the
remaining portion of the record to see if there is any evidence that tends to connect
appellant to the commission of the crime. See Castillo v. State, 221 S.W.3d 689, 691
(Tex.Crim.App. 2007) (citing Solomon v. State, 49 S.W.3d 356, 361 (Tex.Crim.App. 2001)). 
The corroborating evidence does not need to be sufficient to establish appellantâs guilt,
rather it need only tend to connect appellant to the offense. Id. There simply must be
some non-accomplice evidence which tends to connect appellant to the commission of the
offense alleged in the indictment. Id. However, the mere presence of appellant at the
scene of the crime is insufficient corroboration. See Malone v. State, 253 S.W.3d 253, 257
(Tex.Crim.App. 2008). In the final analysis, âthe issue then is not how an appellate court
would independently assess the non-accomplice evidence but whether a rational fact-finder
could conclude that the non-accomplice evidence âtends to connectâ appellant to the
offense.â Simmons v. State, 282 S.W.3d 504, 509 (Tex.Crim.App. 2009). 
Â Â Â Â Â Â Â Â Â Â When we apply the standard of review to the record, we find that appellant admitted
to living at the Alcove address where the meth in question was found. The evidence
further reflected that, while Harris was driving appellant from the Bran residence to her
house on Alcove, appellant admitted to Harris that he might find narcotics at the residence. 
While it is true that appellant denied making the statement, it was up to the fact finder to
resolve that conflict and we must defer to the resolution adopted by the fact finder. See
Evans v. State, 202 S.W.3d 158, 163 (Tex.Crim.App. 2006). Further, there was the
physical evidence seized at the residence, including syringes, spoons with residue, the
supplies needed to manufacture meth, and the actual meth. Then, there is the letter
written by appellant to Warren while both were incarcerated. In the letter, appellant states:
1) that the blame for the meth lab being there to begin with was hers; 2) that she should
have never had the âstuffâ there; and 3) that she should have told Warren that it was there. 
This admission is crucial because the record is clear that Warren knew about the Coleman
fuel can, so it is a reasonable inference that the âstuffâ that appellant was referring to in the
letter was the meth that was found in the freezer in a Mason jar and plastic Tupperware
pitcher. Accordingly, the jury could, following the courtâs charge, rationally find that there
was independent evidence that tended to connect appellant to the commission of the
offense. See Simmons, 282 S.W.3d at 509. Therefore, we overrule appellantâs issue
regarding corroboration of the accomplice witness testimony.
Â Â Â Â Â Â Â Â Â Â Appellantâs next two issues challenge the legal sufficiency of certain aspects of the
Stateâs proof and factual sufficiency of other aspects of the Stateâs proof. Because both
the legal and factual sufficiency of the evidence are challenged, we must first address the
legal sufficiency challenge. See Clewis v. State, 922 S.W.2d 126, 133 (Tex.Crim.App.
1996). If we find the evidence legally sufficient, we will then address the factual sufficiency
issue. Id. at 132. 
Legal Sufficiency 
Â Â Â Â Â Â Â Â Â Â Appellantâs first issue challenges the legal sufficiency of the evidence tending to
connect appellant with the meth found at the Alcove address. In assessing the legal
sufficiency of the evidence, we review all the evidence in the light most favorable to the
verdict to determine whether any rational trier of fact could have found the essential
elements of the offense beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307,
319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Ross v. State, 133 S.W.3d 618, 620
(Tex.Crim.App. 2004). In conducting a legal sufficiency review, an appellate court may not
sit as a thirteenth juror, but rather must uphold the juryâs verdict unless it is irrational or
unsupported by more than a mere modicum of evidence. Moreno v. State, 755 S.W.2d
866, 867 (Tex.Crim.App. 1988). We measure the legal sufficiency of the evidence against
a hypothetically correct jury charge. See Malik v. State, 953 S.W.2d 234, 240
(Tex.Crim.App. 1997).
Â Â Â Â Â Â Â Â Â Â In the case before the court, appellant was not in exclusive possession of the house
where the meth was found. Therefore, we must view the evidence that would link appellant
to the contraband to determine whether a rational juror could have found appellant guilty
beyond a reasonable doubt. See Poindexter v. State 153 S.W.3d 402, 406 (Tex.Crim.App.
2005). The record reflects that appellant was the âownerâ of the home at the Alcove
address.


 The record further reflects that Warren and the two males had been at the home
for a day or so prior to the arrest of Warren on the day that the meth in question was
discovered. During testimony of both appellant and Warren, the only meth discussed as
having been brought into the home was from the âmeth labâ that was the Coleman camp
fuel can. The meth discovered in the freezer was that for which appellant was indicted. 
Harris testified appellant admitted there might be narcotics in the house and, while
appellant denied making the statement, it was for the jury to resolve that conflict. See id. 
There was drug paraphernalia, in the form of syringes and burnt spoons with residue on
them, found in the house. There was meth manufacturing paraphernalia in the form of
tubing, glass beakers and jars, and pickling salt found in the house. Finally, there is the
admission of appellant regarding the âstuffâ that appellant said should not have been there
and that she should have told Warren about. Inasmuch as Warren knew about the
Coleman camp fuel can, the only other item appellantâs admission could refer to is the
meth found in the freezer. All of this evidence could lead a rational trier of fact to find that
appellant exercised control, management, or care over the meth in question and that
appellant knew the matter was contraband. Id.
Â Â Â Â Â Â Â Â Â Â Appellant contends that this court should resolve this issue in her favor based upon
the case of Higgins v. State, 515 S.W.2d 268 (Tex.Crim.App. 1974). In Higgins, the house
in question was a large two story structure consisting of 10 rooms, a basement, and
hallways. There were 10 people in the house at the time of the seizure of contraband. The
only evidence linking the appellant in Higgins to the house was two letters found in the
dining room that were over five and a half months old. Plus, there were personal
belongings of other persons found in the house. These facts distinguish Higgins from the
case at bar. Here, the unequivocal testimony was that appellant was in some ownership
or possessory relationship with the house. Additionally, there is the issue of appellantâs
admission, which alters the factual framework. We do not feel the Higgins case controls
our review of the sufficiency of the evidence in the case before us.
Â Â Â Â Â Â Â Â Â Â When all of the evidence is viewed in the light most favorable to the verdict, we
cannot say the jury was acting irrational when it found appellant guilty beyond a reasonable
doubt. Jackson, 443 U.S. at 319; Ross, 133 S.W.3d at 620. Accordingly, appellantâs first
issue is overruled.
Factual Sufficiency
Â Â Â Â Â Â Â Â Â Â Appellantâs final issue is that the evidence is factually insufficient to support a finding
that appellant possessed at least 400 grams of meth with intent to distribute. When an
appellant challenges the factual sufficiency of the evidence supporting his conviction, the
reviewing court must determine whether, considering all the evidence in a neutral light, the
jury was rationally justified in finding the appellant guilty beyond a reasonable doubt. See
Watson v. State, 204 S.W.3d 404, 415 (Tex.Crim.App. 2006). In performing a factual
sufficiency review, we must give deference to the fact finderâs determinations if supported
by evidence and may not order a new trial simply because we may disagree with the
verdict. See id. at 417. As an appellate court, we are not justified in ordering a new trial
unless there is some objective basis in the record demonstrating that the great weight and
preponderance of the evidence contradicts the juryâs verdict. See id. Additionally, an
appellate opinion addressing factual sufficiency must include a discussion of the most
important evidence that appellant claims undermines the juryâs verdict. Sims v. State, 99
S.W.3d 600, 603 (Tex.Crim.App. 2003). The Court of Criminal Appeals has recently
declared that, when reviewing the evidence for factual sufficiency, the reviewing court
should measure the evidence in a neutral manner against a âhypothetically correct jury
charge.â Vega v. State, 267 S.W.3d 912, 915 (Tex.Crim.App. 2008) (citing Wooley v.
State, 273 S.W.3d 260, 268 (Tex.Crim.App. 2008)). 
Â Â Â Â Â Â Â Â Â Â The essence of appellantâs contention is that, because appellant offered evidence
that is inconsistent with her guilt, when we view all of the evidence in a neutral light, the
evidence becomes insufficient to support the juryâs determination of guilt. Such might be
the case if the appellate court was directed to re-weigh the evidence, however, that is not
our charge. Watson, 204 S.W.3d at 417. Rather, we must point to some objective basis
in the record that demonstrates that the great weight and preponderance of the evidence
contradicts the juryâs verdict. Appellantâs assertion that the conflict in the testimony about
the Coleman camping fuel can does nothing to demonstrate that the evidence contradicts
the juryâs verdict. To begin with, appellantâs analysis completely ignores her confession of
guilt in the letter written to Warren. Then, appellantâs analysis ignores the fact that the jury
has heard all of this evidence and resolved the conflict against her. We cannot simply
decide to ignore the juryâs determination of the factual conflicts. Id. Our review of the 
evidence in a neutral light convinces us that the jury acted rationally when it found
appellant guilty beyond a reasonable doubt. Accordingly, appellantâs final issue is
overruled.
Conclusion
Â Â Â Â Â Â Â Â Â Â Having overruled appellantâs issues, we affirm the judgment of the trial court.
Â 
Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Mackey K. Hancock

Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Â Justice







Do not publish. 




al;
 mso-bidi-font-family:"Times New Roman";
 color:#365F91;
 font-weight:bold;}
span.Heading2Char
 {mso-style-name:"Heading 2 Char";
 mso-style-noshow:yes;
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 2";
 mso-ansi-font-size:13.0pt;
 mso-bidi-font-size:13.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;}
span.Heading3Char
 {mso-style-name:"Heading 3 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 3";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;}
span.Heading4Char
 {mso-style-name:"Heading 4 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 4";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
span.Heading5Char
 {mso-style-name:"Heading 5 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 5";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#243F60;}
span.Heading6Char
 {mso-style-name:"Heading 6 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 6";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#243F60;
 font-style:italic;}
span.Heading7Char
 {mso-style-name:"Heading 7 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 7";
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#404040;
 font-style:italic;}
span.Heading8Char
 {mso-style-name:"Heading 8 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 8";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;}
span.Heading9Char
 {mso-style-name:"Heading 9 Char";
 mso-style-priority:9;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Heading 9";
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#404040;
 font-style:italic;}
span.TitleChar
 {mso-style-name:"Title Char";
 mso-style-priority:10;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Title;
 mso-ansi-font-size:26.0pt;
 mso-bidi-font-size:26.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#17365D;
 letter-spacing:.25pt;
 mso-font-kerning:14.0pt;}
span.SubtitleChar
 {mso-style-name:"Subtitle Char";
 mso-style-priority:11;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Subtitle;
 mso-ansi-font-size:12.0pt;
 mso-bidi-font-size:12.0pt;
 font-family:"Arial","sans-serif";
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:"Times New Roman";
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:"Times New Roman";
 color:#4F81BD;
 letter-spacing:.75pt;
 font-style:italic;}
span.QuoteChar
 {mso-style-name:"Quote Char";
 mso-style-priority:29;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Quote;
 color:black;
 font-style:italic;}
span.IntenseQuoteChar
 {mso-style-name:"Intense Quote Char";
 mso-style-priority:30;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Intense Quote";
 color:#4F81BD;
 font-weight:bold;
 font-style:italic;}
p.NewDocument, li.NewDocument, div.NewDocument
 {mso-style-name:"New Document";
 mso-style-unhide:no;
 mso-style-qformat:yes;
 mso-style-next:Normal;
 margin-top:0in;
 margin-right:0in;
 margin-bottom:10.0pt;
 margin-left:0in;
 line-height:115%;
 mso-pagination:widow-orphan;
 font-size:12.0pt;
 mso-bidi-font-size:11.0pt;
 font-family:"Arial","sans-serif";
 mso-fareast-font-family:Arial;
 mso-bidi-language:EN-US;}
span.BalloonTextChar
 {mso-style-name:"Balloon Text Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:"Balloon Text";
 mso-ansi-font-size:8.0pt;
 mso-bidi-font-size:8.0pt;
 font-family:"Tahoma","sans-serif";
 mso-ascii-font-family:Tahoma;
 mso-hansi-font-family:Tahoma;
 mso-bidi-font-family:Tahoma;
 mso-bidi-language:EN-US;}
span.HeaderChar
 {mso-style-name:"Header Char";
 mso-style-noshow:yes;
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Header;
 mso-ansi-font-size:11.0pt;
 mso-bidi-font-size:11.0pt;
 mso-bidi-language:EN-US;}
span.FooterChar
 {mso-style-name:"Footer Char";
 mso-style-priority:99;
 mso-style-unhide:no;
 mso-style-locked:yes;
 mso-style-link:Footer;
 mso-ansi-font-size:11.0pt;
 mso-bidi-font-size:11.0pt;
 mso-bidi-language:EN-US;}
span.SpellE
 {mso-style-name:"";
 mso-spl-e:yes;}
span.GramE
 {mso-style-name:"";
 mso-gram-e:yes;}
.MsoChpDefault
 {mso-style-type:export-only;
 mso-default-props:yes;
 font-size:10.0pt;
 mso-ansi-font-size:10.0pt;
 mso-bidi-font-size:10.0pt;
 mso-ascii-font-family:Arial;
 mso-fareast-font-family:Arial;
 mso-hansi-font-family:Arial;
 mso-bidi-font-family:Arial;}
 /* Page Definitions */
 @page
 {mso-footnote-separator:url("07-11-0154.CV%20Order_files/header.htm") fs;
 mso-footnote-continuation-separator:url("07-11-0154.CV%20Order_files/header.htm") fcs;
 mso-endnote-separator:url("07-11-0154.CV%20Order_files/header.htm") es;
 mso-endnote-continuation-separator:url("07-11-0154.CV%20Order_files/header.htm") ecs;}
@page WordSection1
 {size:8.5in 11.0in;
 margin:1.0in 1.0in 1.0in 1.0in;
 mso-header-margin:.5in;
 mso-footer-margin:.5in;
 mso-page-numbers:1;
 mso-title-page:yes;
 mso-footer:url("07-11-0154.CV%20Order_files/header.htm") f1;
 mso-paper-source:0;}
div.WordSection1
 {page:WordSection1;}
@page WordSection2
 {size:8.5in 11.0in;
 margin:1.0in 1.0in 1.0in 1.0in;
 mso-header-margin:.5in;
 mso-footer-margin:.5in;
 mso-title-page:yes;
 mso-footer:url("07-11-0154.CV%20Order_files/header.htm") f2;
 mso-paper-source:0;}
div.WordSection2
 {page:WordSection2;}
-->








NO. 07-11-00154-CV

Â 

IN THE COURT OF APPEALS

Â 

FOR THE
SEVENTH DISTRICT OF TEXAS

Â 

AT
AMARILLO

Â 

PANEL D

Â 



APRIL
26, 2011

Â 



Â 

BANK OF AMERICA, N.A., APPELLANT

Â 

v.

Â 

LINDA LILLY, APPELLEE 



Â 



Â 

 FROM THE 146TH DISTRICT COURT OF
BELL COUNTY;

Â 

NO. 247,955-B; HONORABLE RICK MORRIS, JUDGE



Â 



Â 

Before QUINN,
C.J., and CAMPBELL and PIRTLE, JJ.

Â 

Â 

ORDER OF ABATEMENT

Â 

Â 

Appellant Bank of America, N.A.,
filed a motion to extend the time for filing its notice of appeal.Â  Tex. R. App. P. 26.3.Â  Before taking up the motion, we sua sponte
question our jurisdiction.Â  See Jones v. Morales, 318 S.W.3d 419,
422 (Tex.App.--Amarillo 2010, pet. denied) (court
addressed possible jurisdictional issue on its own motion).

Â Â Â Â Â Â Â Â Â Â Â  The
clerkÂs record has been filed.Â  It
indicates on January 28, 2011, the trial court granted appellee
Linda LillyÂs no-evidence motion for summary judgment against Bank of America
and signed an order severing Bank of AmericaÂs claim against her into a
separate proceeding bearing trial court cause number 247,955-B.Â  According to the severance order, Â[t]he
severed case shall proceed to final judgment separate and apart from those
claims by [Bank of America] against Defendant Lilly Holmes, Inc., which remain
pending . . . .ÂÂ  The record contains no
document identified as a final judgment in cause number 247,955-B.Â  

Â Â Â Â Â Â Â Â Â Â Â  A
court of appeals has no appellate jurisdiction over an interlocutory order
unless expressly authorized by statute.Â  New York Underwriters Ins.
Co. v. Sanchez, 799 S.W.2d 677, 679 (Tex. 1990) (per curiam).Â  The parties do not assert and the record does
not indicate this is an interlocutory appeal authorized by statute or agreement
and court order.Â  See, e.g., Tex. Civ. Prac.
& Rem. Code Ann. Â§ 51.014(a) (identifying certain immediately appealable
interlocutory orders), Â§ 51.014(d) (otherwise unappealable
interlocutory order may be made appealable by agreements of parties and order
of court) (West 2008).Â  ÂAs a rule, the
severance of an interlocutory judgment into a separate cause makes it final.ÂÂ  Diversified
Fin. Sys., Inc. v. Hill, Heard, OÂNeal, Gilstrap
& Goetz, P.C., 63 S.W.3d 795, 795 (Tex. 2001) (per curiam)
(citing Farmer v. Ben E. Keith Co.,
907 S.W.2d 495, 496 (Tex. 1995) (per curiam)).Â  But where, as here, a severance order
expressly contemplates the severed claims will Âproceed to final judgment,Â a
final judgment is precluded until a later judgment is signed.Â  In re S.A.A., No. 02-08-0080-CV, 2008 Tex. App. Lexis 3428, at *3 (Tex.App.--Fort Worth May 8, 2008, no pet.) (per curiam, mem.
op.) (citing Diversified
Fin. Sys., 63 S.W.3d at 795).Â Â  

Â Â Â Â Â Â Â Â Â Â Â  Accordingly,
we abate this appeal to allow Bank of America time to obtain a signed final
judgment in cause number 247,955-B.Â  See In re S.A.A., 2008 Tex. App. Lexis
3428, at *3 (when severance order contemplated further action, appellate court
granted parties opportunity to obtain final judgment); Iacono v. Lyons, 6 S.W.3d 715, 717 (Tex.App.--Houston
[1st Dist.] 1999, no pet.) (court applied appellate
rule 27.2 to allow party to cure jurisdictional defect by obtaining order
creating finality).Â  Bank of America
shall cause the signed final judgment to be included in a supplemental clerkÂs
record filed in this court within thirty days of this order.Â  Failure to comply with this order will result
in dismissal of this appeal for want of jurisdiction.Â  Tex. R. App. P. 42.3(a); In re S.A.A. at *2, *3-*4; Lyons at 717.Â  Bank of AmericaÂs motion for extension of
time to file its notice of appeal remains pending.

Â Â Â Â Â Â Â Â Â Â Â  It
is so ordered.

Per Curiam

Â 








Â