NO. 07-09-00223-CR

 

IN THE COURT OF APPEALS

 

FOR THE
SEVENTH DISTRICT OF TEXAS

 

AT
AMARILLO

 

PANEL B

 



JULY
13, 2010

 



 

ANTONIO G. OLIVAREZ, APPELLANT

 

v.

 

THE STATE OF TEXAS, APPELLEE 



 



 

 FROM THE 364TH DISTRICT COURT OF LUBBOCK
COUNTY;

 

NO. 2007-416,403; HONORABLE BRADLEY S. UNDERWOOD, JUDGE



 



 

Before QUINN,
C.J., and CAMPBELL and HANCOCK, JJ.

 

 

MEMORANDUM OPINION

 

Appellant, Antonio G. Olivarez, was
convicted of assault on a public servant[1]
and of taking a police officer’s weapon,[2]
both third-degree felonies.  The jury
assessed an enhanced punishment of twenty years imprisonment for each
offense.  We affirm.

 

 

Factual and Procedural History

            Just
after midnight on May 7, 2007, Lubbock Police Officer Travis Bratton was on
patrol, driving south on Avenue Q.  After
meeting a vehicle traveling north on Avenue Q, Bratton noticed, in his rear
view mirror, that the vehicle’s rear license plate did not appear to be
properly illuminated.  Bratton made a
U-turn to follow the vehicle and extinguished his headlights for a moment to
confirm his initial observation.  After
confirming that the license plate was not properly illuminated, Bratton
initiated a traffic stop.  The driver of
the vehicle, identified as appellant, pulled into a parking lot, and Bratton
pulled in behind him.  Rather than
remaining stopped, however, appellant jumped a curb and drove off in an
easterly direction on 24th Street.

            Bratton
followed the vehicle, found it crashed into a fence, and observed appellant
exit the vehicle and begin running. 
Bratton pursued appellant into a residential backyard.  As appellant attempted to climb over a fence,
Bratton caught up to him, pulled him down from the fence, and attempted to
bring him to the ground.  When appellant
resisted and returned to his fence-scaling efforts, Bratton attempted to use a taser on appellant. 
Bratton missed making a connection between the taser’s
leads and appellant’s body but approached and used the taser
on him as a stun gun (without the leads connected to appellant).  Appellant came down off the fence.

            Bratton
and appellant fell to the ground and struggled. 
Somehow, Bratton testified, appellant was able to dispossess Bratton of
the taser and use it on him.  After sustaining shocks from the taser to his neck, shoulder, side, and, perhaps, chest,
Bratton forced appellant to relinquish control of the taser
and chased after appellant who had resumed his flight.

            Bratton
again caught up to appellant, and the two struggled over possession of the taser.  During the struggle,
appellant managed to use the taser against Bratton a
second time and regain control of the taser.  He then began running toward the fence
again.  Bratton pulled out his firearm
and directed appellant to drop the taser or else run
the risk of being shot.

            Bratton
heard sirens approaching and began to yell so that fellow officers could locate
him in the backyard.  As appellant made
one last effort to scale the fence, Bratton explained to him that, if appellant
continued to possess the taser, Bratton would shoot
him.  There appeared to be a
stand-off.  Bratton alerted the
approaching officers that appellant had the taser.  A fellow officer directed Bratton to shoot
appellant.  Having heard that directive,
appellant tossed the taser.  About that time, Bratton’s fellow officers
came into the backyard and took appellant into custody.

            Appellant
was taken to the hospital where he admitted to an officer that he used the taser on Bratton and expressed to other officers his desire
to apologize to Bratton.  He apologized
to Bratton personally on the second morning of trial and expressed his
gratitude that Bratton did not shoot him when the other officer suggested he do
so. 

            Appellant
was convicted of assault on a public servant and of taking a weapon from a
police officer.  Appellant timely
appealed and, by two issues, asks this Court to determine whether legally and
factually sufficient evidence supports those convictions.

Standards of Review

            In
assessing the legal sufficiency of the evidence, we review all the evidence in
the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of
the offense beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); Ross v. State,
133 S.W.3d 618, 620 (Tex.Crim.App. 2004).  In conducting a legal sufficiency review, an
appellate court may not sit as a thirteenth juror, but rather must uphold the
jury's verdict unless it is irrational or unsupported by more than a mere
modicum of evidence.  Moreno
v. State, 755 S.W.2d 866, 867 (Tex.Crim.App.
1988).

            In
assessing the factual sufficiency of the evidence, we must determine whether,
considering all the evidence in a neutral light, the jury was rationally justified
in finding the appellant guilty beyond a reasonable doubt.  See Watson v. State, 204 S.W.3d 404, 415 (Tex.Crim.App.
2006).  In performing a factual
sufficiency review, we must give deference to the trier
of fact’s determinations if supported by evidence and may not order a new trial
simply because we may disagree with the verdict.  See id. at
417.  As an appellate court, we are not
justified in ordering a new trial unless there is some objective basis in the
record demonstrating that the great weight and preponderance of the evidence
contradicts the jury's verdict.  See
id.  Additionally, an appellate
opinion addressing factual sufficiency must include a discussion of the most
important evidence that appellant claims undermines
the jury's verdict.  Sims
v. State, 99 S.W.3d 600, 603 (Tex.Crim.App.
2003).  However, when a
defendant's version of the facts conflicts with other evidence, we must
recognize that it is the jury's prerogative to judge the credibility of the
evidence and to ascribe the weight to be given to the evidence.  See Jones v. State, 944 S.W.2d 642, 647–48 (Tex.Crim.App.
1996).

Analysis

            The
record shows that appellant possessed the taser on
two separate occasions, each being relevant to one of the two offenses for
which appellant was convicted.

Assault on a Public Servant

            A
person commits assault if he or she “intentionally, knowingly, or recklessly
causes bodily injury to another.”  Tex. Penal Code Ann. § 22.01(a)(1).  Assault is a
Class A misdemeanor but is elevated to a third-degree felony if “committed
against . . . a person the actor knows is a public servant while the public
servant is lawfully discharging an official duty, or in retaliation or on
account of an exercise of official power or performance of an official duty as
a public servant.”  Id. § 22.01(b)(1).

Mental State

            A
person acts intentionally “when it is his conscious objective or desire to
engage in the conduct or cause the result.” 
Id. § 6.03(a) (Vernon 2003).  A person acts knowingly “when he is aware of
the nature of his conduct or that the circumstances exist” or “when he is aware
that his conduct is reasonably certain to cause the result.”  Id. § 6.03(b).  A person acts recklessly “when he is aware of
but consciously disregards a substantial and unjustifiable risk that the
circumstances exist or the result will occur.” 
Id. § 6.03(c).  The trier of fact
may infer intent from direct evidence and from circumstances surrounding the
act.  See Guevara v. State,
152 S.W.3d 45, 50 (Tex.Crim.App. 2004); Brown v.
State, 122 S.W.3d 794, 800 (Tex.Crim.App. 2003).

            Appellant
challenges the sufficiency of the evidence to show that he acted with the
requisite intent when he used the taser against
Bratton.  We revisit and elaborate on the
details of the first occasion on which appellant gained control of the taser.

            Following
a brief pursuit, Bratton found appellant in a backyard trying to scale a wooden
fence and go into the alley.  Bratton
pulled him down off the fence and directed him to get on the ground.  Bratton testified that appellant just stood
there and looked at him for a moment. 
Bratton then tried to force appellant to the ground.  A struggle between the two men ensued in
which appellant swung a fist at Bratton but apparently missed.

            Bratton
drew his taser and ordered appellant to get to the
ground.  Faced with appellant’s continued
defiance, Bratton fired his taser but missed making a
connection with the leads.  As appellant
tried to scale the fence, Bratton used the taser on
him in what Bratton explained is the taser’s “drive
stun” function.  Bratton explained that a
drive stun delivers less voltage because the taser’s
leads are not connected to the person but remains powerful at any rate.  In order to effectively drive stun a person,
Bratton testified, the shooter must maintain direct contact between the taser and the person.

            Appellant
came off the fence at that point, and a brief struggle ensued in which both men
went to the ground.  Bratton was on top
of appellant and directed him to roll over so that he could be placed under
arrest.  Appellant continued to struggle
and responded in a “distressed” and “upset” manner that he was not going or
could not go to jail.  At this point,
Bratton had decided to use the taser again on the
still-defiant appellant but discovered that appellant had the taser.  Then,
appellant began drive stunning Bratton. 
Bratton testified that he could not recall how appellant obtained
possession of the taser.

            Bratton
testified that appellant used the taser on him on
several places on his body.  He also
explained that, to operate the taser, one must turn a
switch to activate it and then pull the trigger, meaning it was likely that the
switch remained on from Bratton’s earlier use so that appellant would only need
to pull the trigger to employ the taser.  Bratton described the pain level associated
with getting drive stunned as a nine or ten on a scale of one to ten.  He testified that he yelled out in pain and
specifically recalled getting drive stunned in the neck, explaining that “it
hurt pretty bad.”

            After
appellant used the taser on Bratton, Bratton was able
to pin down appellant’s arm and avoid being stunned further.  Bratton struck appellant in the face with his
fist two or three times, and appellant dropped the taser.  As Bratton reached over to get it, appellant
pushed the officer off of him and returned to the fence.

            The
record shows that appellant, reluctant to go to jail and trying to flee
Bratton, held the taser in his hand and used it to
stun the officer on the neck, shoulder, and side as the two men struggled on
the ground.  Bratton experienced
significant pain from the taser, and appellant
continued his efforts to flee.  From the
evidence, a rational jury could conclude that appellant intentionally used the taser against Bratton. 
Legally sufficient evidence supports the conviction for assault on a
public servant.

            To
support his factual sufficiency contention as to the assault conviction,
appellant emphasizes Bratton’s testimony regarding the operation of the taser.  He testified
that unless a person turns the taser off, it will
keep discharging for five seconds after a person pulls the trigger.  He also admitted that, if a taser is discharging while located between two people, both
people may experience effects of the taser.  Appellant seems to suggest that the shock
Bratton experienced resulted from contact with appellant as Bratton used the taser or that involuntary muscle contractions resulting
from being drive stunned could have caused appellant to employ the taser during the struggle. 
However, Bratton saw the taser in appellant’s
left hand and testified that appellant made contact between the taser and Bratton’s body more than once and in a number of
locations.  This evidence would suggest,
contrary to appellant’s assertions, that appellant’s actions in discharging the
taser on Bratton were intentional.  Appellant’s sole possession of the taser and the number and variety of places on which
appellant used the taser on Bratton suggest that
appellant’s movements were products of his own volition rather than repeated
accidental or involuntary responses. 
Further, the jury heard evidence that appellant expressed his desire to
not go to jail from which it could have inferred that appellant intentionally
employed the taser against Bratton to avoid being
arrested.  Viewing the evidence,
including that evidence to which appellant points as undermining the verdict,
in a neutral light, we conclude that the evidence supporting the conviction is
factually sufficient.  We overrule
appellant’s first point of error.

            We
note that Bratton specifically testified that he is uncertain how appellant
first got the taser as the two were struggling on the
ground.  For this reason, the evidence
concerning the first occasion on which appellant gained control of the taser may not satisfy the elements of taking or attempting
to take a weapon from an officer.  We
need not fully address that issue, however, because the details of the second
occasion on which appellant gained possession of the taser
do satisfy those elements.

Taking a Weapon from a Police Officer

            The
Texas Penal Code provides as follows:

A person commits an offense if the person intentionally or knowingly
and with force takes or attempts to take from a peace officer, employee or
official of a correctional facility, parole officer, or community supervision
and corrections department officer the officer's, employee's, or official's
firearm, nightstick, stun gun, or personal protection chemical dispensing
device with the intention of harming the officer, employee, or official or a
third person.

Tex. Penal Code Ann. § 38.14(b). 
A “stun gun” is “a device designed to propel darts or other projectiles
attached to wires that, on contact, will deliver an electrical pulse capable of
incapacitating a person.”  Id. at
§ 38.14(a)(2). 
The actor is presumed to have known that the peace officer was, in fact,
a peace officer if “the officer . . . was wearing a distinctive uniform or
badge indicating his employment” or if the officer identified himself as a
peace officer.  Id.
§ 38.14(c).  Again, the State was
required to show that appellant acted intentionally, that it was “his conscious
objective or desire to engage in the conduct or cause the result.”  Id. § 6.03(a)

            Appellant
challenges the evidence of intent and force. 
Keeping in mind that the trier of fact may
infer intent from direct evidence and from circumstances surrounding the act,
we examine the details surrounding the second time appellant gained possession
of the taser.  See
Guevara, 152 S.W.3d at 50.  We look for evidence of how appellant gained
control of the taser and with what mental state he
did so.

            We
rejoin the night’s events as appellant got up and ran toward the fence again
after having struggled with Bratton and having used the taser
on him.  Bratton had regained control of
the taser, caught up to appellant, and prepared to
drive stun him.  Appellant turned around,
used both hands to grab the officer’s wrist and hand, and redirected the taser toward Bratton’s forearm.  Bratton was unable to deactivate the taser because of the positions of his hands, the taser, and appellant’s grip.  Bratton was again drive stunned by the taser, this time in the arm, causing him to drop the taser.  Both men
tried to get the taser but appellant got it
first.  After appellant retrieved the taser, he again started running toward the fence.  At this point, Bratton drew his firearm.

            He
directed appellant to drop the taser on the ground or
“there was a good possibility that he was going to get shot.”  Appellant taunted Bratton, encouraging him to
go ahead and shoot.  Bratton heard fellow
officers approaching the area.  He
radioed to them and also yelled so that fellow officers could locate the two men.  He then heard several of his fellow officers
running toward the scene.  Upon hearing
the same thing, appellant made one last attempt to get over the fence.  Bratton alerted the responding officers to
the fact that appellant had his taser.  The corporal then directed Bratton to shoot,
at which point appellant threw down the taser.

            The
State had to prove that appellant intentionally or knowingly took or attempted
to take the taser from Bratton.  We initially note that appellant had earlier
expressed his displeasure at the prospect of going to jail.  We also know that appellant had previously
used the taser against the officer, at least
suggesting that he intended to do so again to further his efforts to avoid
arrest.  Also relevant to appellant’s
intent are his repeated attempts to get away and his continued physical struggles
with Bratton.  The jury could infer from
appellant’s swift retrieval of the taser, after his
grip and redirection of the taser forced Bratton to
drop it, that it was appellant’s conscious objective to regain control of the taser.  The record
also shows that appellant maintained control of the taser
despite Bratton’s directions to put it down. 
He kept the taser until another officer
directed Bratton to shoot appellant.  The
record does not reveal, and appellant does not point to, evidence that would
show appellant grabbed Bratton’s hand and the taser,
redirected the taser to drive stun Bratton, and then
retrieved and maintained the taser accidentally or in
any state of mind other than intentionally or knowingly.

            As
to the element of force, Bratton testified that he was going to use the taser against appellant again when appellant used both
hands to redirect the taser at Bratton and drive stun
him again by making contact between the taser and
Bratton’s forearm.  Bratton testified
that, due to the placement of appellant’s grip on the taser,
Bratton was unable to prevent the taser from striking
him in the arm.  Appellant’s maneuver and
the attendant shock forced Bratton to release the taser,
at which point appellant quickly seized it. 
The record, then, shows that by turning the taser
against Bratton, and maintaining his grip on the taser
as it shocked Bratton, appellant used force in taking or attempting to take
Bratton’s taser. 
Of course, the resulting shock is also a relevant use of force in
appellant’s efforts to take control of Bratton’s taser.  The record does not suggest any other manner
by which appellant gained possession of the taser
during this portion of the two men’s encounter. 
Legally and factually sufficient evidence supports the jury’s findings
as to both mental state and use of force. 
We overrule appellant’s second issue.

Conclusion

            Contrary
to assertions made in appellant’s brief and notations in the judgment that
suggest appellant pleaded guilty to both offenses, the reporter’s record shows
that appellant pleaded not guilty to both offenses.  We are authorized to reform the trial court’s
judgment so it may speak the truth and exercise such authority here by
correcting the trial court’s judgment to reflect that appellant pleaded not
guilty to both offenses.  See French
v. State, 830 S.W.2d 607, 609 (Tex.Crim.App.
1992).  Having overruled appellant’s two
issues on appeal, we sustain the trial court’s judgment as reformed.  See Tex.
R. App. P. 43.2(b).

 

                                                                                                Mackey
K. Hancock

                                                                                                            Justice

 

            








Do
not publish.  

 











[1] Tex. Penal Code Ann. § 22.01(a)(1), (b)(1) (Vernon Supp.
2009).

 





[2] Tex. Penal
Code Ann. § 38.14(b) (Vernon Supp. 2009).